No. 63,321

CHARLOTTE GREGORY, as Guardian and Conservator of MARK A. MARQUETTE, a disabled person, *Appellee*, v. LLOYD CAREY, C.R.N.A.; SOUTH CENTRAL ANESTHESIA SERVICES, P.A.; GERSHOM MAILMAN, M.D.; and ST. JOSEPH MEDICAL CENTER, *Appellants*.

(791 P.2d 1329)

Opinion filed April 18, 1990.

*Darrell D. Kellogg*, of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, argued the cause, and *Charles E. Hill*, of the same firm, was with him on the briefs for appellants.

*Mark B. Hutton* and *Gerald Michaud*, of Michaud, Hutton & Bradshaw, of Wichita, argued the cause, and *Marlys A. Marshall*, of the same firm, was with them on the briefs for appellees.

*Wayne T. Stratton*, of Goodell, Stratton, Edmonds & Palmer, of Topeka, and *Marla J. Luckert*, of the same firm, were on the brief for *amici curiae* Kansas Medical Society and Kansas Hospital Association.

The opinion of the court was delivered by

LOCKETT, J.: On October 28, 1985, Mark Marquette sustained catastrophic brain damage while being prepared for knee surgery. He has since been in a persistent vegetative state—a state of "wakeful unresponsiveness"—from which he does not visibly react and will never completely recover. Charlotte Gregory brought this action as Marquette's guardian and conservator. After extensive pretrial discovery, defendants admitted liability and the case

went to trial on the sole issue of damages. The jury returned the following verdict:

| | |
|---|---:|
| Present value of future medical expenses: | $2,920,000 |
| Medical expenses to date: | 602,077 |
| Pain and suffering to date: | 70,000 |
| Future pain and suffering: | 930,000 |
| Disability to date: | 45,000 |
| Future disability: | 900,000 |
| Loss of income to date: | 89,544 |
| Present value of future lost income: | 775,160 |
| TOTAL DAMAGES: | $6,331,781 |

On appeal, defendants claim the trial court erred by: (1) excluding defendants' proffered evidence concerning an annuity insurance contract to pay future medical expenses of $500 per day with a 6% inflation factor; (2) submitting the issue of conscious pain and suffering to the jury; and (3) allowing argument concerning the loss of enjoyment of life as a factor in determining damages. In addition, the defendants claim that the jury's verdict is excessive as a matter of law and request this court to abolish the collateral source rule in effect at the time Marquette sustained injury.

### The Proffered Testimony of Defendants' Annuitist

A defendant in any action is entitled to have amounts allowed for future damages reduced to present worth where there are reasonable grounds to expect that the amount awarded may be safely and profitably invested. Evidence demonstrating how to compute present worth, either by way of expert testimony or appropriate mathematical tables or formulae, is admissible in any action in which substantial future damages are claimed. *Gannaway v. Missouri-Kansas-Texas Rld. Co.*, 2 Kan. App. 2d 81, 575 P.2d 566 (1978).

Defendants proffered the testimony of S. Gary Kuzina, an expert in single premium annuities. According to Mr. Kuzina, an annuity is a contract between an individual and a seller of an annuity in which the seller promises to make certain payments in the future in exchange for a lump sum of money. A personal annuity is one which an individual plaintiff can purchase for himself, as opposed to a structured settlement annuity which can be

purchased only by the tortfeasor. The premium for the annuity is dependent upon the rate of return on investment which the seller can obtain and upon the life expectancy of the proposed annuitant. The insurers selling the annuities review medical records and arrive at their own opinion of life expectancy, upon which they base the premium charge.

Mr. Kuzina also testified that he had obtained quotes from Allstate Insurance Company and First Colony for a personal annuity which would pay $500 per day for Mr. Marquette's medical expenses, with the daily amount increased by 6% each year for as long as Mr. Marquette remained alive. Both Allstate Insurance Company and First Colony are rated A+ (the top rating) by A.M. Best Company, a well-known analyst of insurance companies.

The witness further testified that Allstate rated Marquette's age at 77 years, *i.e.*, his life expectancy is the same as a 77-year-old male, while First Colony rated his age at 74. (The record does not indicate First Colony's quote of cost for its annuity.) Kuzina stated that the cost of the Allstate annuity was $1,698,459, but the price of the annuity contract was guaranteed only through December 26, 1988. (It must be noted that since the trial ended December 16, 1988, Allstate's offer would lapse prior to the expiration of the time for either party to appeal the judgment.)

Kuzina had no knowledge of what documents or medical records were provided to Allstate or the qualifications of the unknown person or persons who determined Marquette had a life expectancy of 8 years, or how Allstate's annuity cost was determined. Contrary to Allstate's 8-year life expectancy rating, plaintiff's experts, Marquette's treating physicians, testified that Marquette has a life expectancy within a range of 20 to 34 years.

When granting the plaintiff's motion in limine, the judge found that our statement in *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 757 P.2d 251 (1988), as to the common-law right to a jury trial to determine damages, though dicta, prevented the introduction of the cost of the annuity contract into evidence. In addition, the court found the speculative nature of the cost of care in terms of a single premium annuity, the time limitation imposed by Allstate for accepting the contract, and the hearsay problems inherent in plaintiff's inability to cross-examine the witness as to Allstate's basis for submitting the offer all

weighed in favor of granting the motion. At trial, the court generally followed PIK Civ. 2d 9.01 when instructing the jury it should determine the reasonable expenses of necessary medical care, hospitalization, and treatment received, and reasonable expenses for necessary medical care, hospitalization, and treatment reasonably expected to be needed in the future, reduced to present value.

Defendants claim the exclusion of the testimony was erroneous because: (1) the annuitist would have described a contract offered with only one condition precedent—the payment of the premium; (2) *Kansas Malpractice Victims Coalition v. Bell* does not preclude this testimony; (3) the proffer was not made in relation to any element of damages other than future medical expenses; and (4) cross-examination of those in the decision-making process of the company offering the annuity is unnecessary since, once sold, an annuity pays as contracted regardless of whether the calculations upon which it was based were correct.

Though the trial court ruled that our finding in *Kansas Malpractice Victims Coalition v. Bell* prohibited the introduction of the cost of the annuity contract into evidence, the judge's ruling that the proffered testimony was inadmissible hearsay, if correct, does not require us to determine the constitutional issue.

Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible. K.S.A. 1989 Supp. 60-460. Though the witness may have been an expert on annuity contracts, the judge determined that the witness did not have sufficient knowledge to be cross-examined about the underlying facts and considerations in the decision-making process of the company offering the annuity; therefore, his testimony was hearsay.

Admission of expert testimony lies within the sound discretion of the trial court and its ruling thereon will not be disturbed on appeal in the absence of abuse of discretion. *Walters v. Hitchcock*, 237 Kan. 31, 35, 697 P.2d 847 (1985). The test on appellate review of whether the trial court abused its discretion is whether no reasonable person would agree with the trial court. If any reasonable person would agree, appellate courts will not disturb

the trial court's decision. *Hoffman v. Haug*, 242 Kan. 867, 873, 752 P.2d 124 (1988).

Even if the witness was an expert in annuity contracts, his testimony regarding Allstate's quote for the annuity was not based on fact or data perceived or personally known or made known to him and was outside the knowledge, skill, experience, and training possessed by the witness. Under the facts of this case, the trial court properly excluded the hearsay testimony of the witness.

### The Collateral Source Rule

The collateral source rule is a common-law rule preventing the introduction of payments made to or benefits conferred on the injured party from other sources which are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable. Stated another way, the collateral source rule provides that benefits received by the plaintiff from a source wholly independent of and collateral to the wrongdoer will not diminish the damages otherwise recoverable from the wrongdoer. *Farley v. Engelken*, 241 Kan. 663, 665-66, 740 P.2d 1058 (1987).

In *Farley*, 241 Kan. at 678, and earlier in *Wentling v. Medical Anesthesia Serv.*, 237 Kan. 503, 518, 701 P.2d 939 (1985), on equal protection grounds, a majority of this court invalidated legislative attempts to abrogate the collateral source rule in medical malpractice actions. In response to *Farley*, the legislature enacted K.S.A. 1989 Supp. 60-3801 *et seq.* These statutes allow for the admission of certain collateral source evidence in personal injury or death actions involving claims over $150,000. However, this legislation applies only to causes of action which accrue on or after July 1, 1988. K.S.A. 1989 Supp. 60-3807. Since Marquette was injured on October 28, 1985, K.S.A. 1989 Supp. 60-3801 *et seq.* are inapplicable in this case and the common-law collateral source rule applies.

The defendants proffered evidence that Marquette had received certain disability benefits and that private insurance had already paid for a substantial portion of his medical expenses. The trial court rejected the admission of the evidence because it violated the collateral source rule in effect at the time of the injury.

Defendants do not contest the trial court's ruling; rather, they urge this court to abolish the rule.

In *Farley* and *Wentling* we recognized that the legislature may modify the common law, provided that the modification is made within constitutional parameters. Implicit in this court's unwillingness to abolish the collateral source rule in *Farley* is our recognition that the legislature, as the direct representative of the people, is first allowed to determine public policy. Where the legislature has enacted statutory provisions that clearly state public policy, the court may only determine if the legislature's statement of public policy is constitutional.

When the legislature enacted K.S.A. 1989 Supp. 60-3801 *et seq.*, which specifically allows the admission of certain collateral source evidence in personal injury or death actions involving claims over $150,000, which accrued on or after July 1, 1988, it clearly intended to deny the admission of collateral source evidence in personal injury or death actions which arose prior to July 1, 1988. We decline defendants' invitation to overrule the legislature's statement of public policy.

## Conscious Pain and Suffering

Kansas follows the majority rule that damages are recoverable only for pain and suffering which is consciously experienced. *Leiker v. Gafford*, 245 Kan. 325, 342, 778 P.2d 823 (1989). At the close of plaintiff's evidence, defendants moved for partial summary judgment on the issue of damages for pain and suffering, claiming that the evidence merely "suggests" that Marquette consciously experiences pain.

The trial court denied this motion, finding:

"[T]he evidence would justify a finding by a jury of reasonable people that Mark Marquette, a severely brain injured person existing in a persistent vegetative state, has the capacity for and does experience pain and suffering on a cortical or cognitive level. That constitutes pain and suffering under Kansas law sufficient to submit that issue to the jury."

The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. On appeal we apply the same rule and, where we find reasonable minds could differ

as to the conclusions drawn from the evidence, summary judgment must be denied. *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 306-07, 756 P.2d 416 (1988).

The trial court cited the following testimony as support for its ruling: Dr. Dilawer Abbas, a neurologist, testified that when he stuck Marquette with a pin, "there was some reaction when he moaned and sighed." When asked to state his opinion as to whether Marquette appreciated the pain resulting from the pinprick, Dr. Abbas answered: "I said that he moaned and took some deep sighs to pinprick all over, suggesting that he did appreciate the pain." Dr. Abbas also opined that Marquette's response "was not purely a reflex."

Dr. Melvin Karges, a specialist in physical medicine and rehabilitation, was advised of Marquette's reactions to the pinprick tests and of medical records which indicate that Marquette had grimaced during stretching exercises. As for whether these facts indicated conscious pain, Dr. Karges testified: "[T]here are certain cortical levels of pain behavior such as grimacing and moaning that would raise a high suspicion that there is cortical perception." Dr. Karges further testified: "[G]rimacing and moaning . . . definitely does raise a question of cortical response."

Dr. William Singer, a neurologist who treated Marquette, testified: "[T]here is evidence that he has some response to pain, which would indicate that he has some awareness, at least to a small degree."

Testimony other than that of the medical experts also indicates that Marquette consciously experiences pain. The determination of whether an injured party has experienced conscious pain and suffering may be established by either a lay witness or an expert medical witness. The testimony of the lay witnesses need not be set out here.

In addition to the testimony of the witnesses, a videotape of a day in the life of Mark Marquette was admitted into evidence and shown to the jury. In contrast to the defendants' claim that the videotape indicates that Mark Marquette is more like a vegetable that reacts to stimuli, the plaintiff claims it shows that Marquette consciously suffers the pain. We have reviewed the videotape and find that it also supports the jury's verdict.

Under the facts of this case, the question of whether Mark Marquette consciously suffered pain was a proper question for the jury to determine.

### The Loss of Enjoyment of Life

The trial court refused to allow plaintiff to argue Marquette suffered disfigurement or mental anguish because there was insufficient evidence to show that Marquette could perceive these conditions. However, over defendants' objections, plaintiff's attorney was permitted to argue that Marquette suffered a loss of enjoyment of life, compensable as an element of pain, suffering, and disability.

Defendants claim the trial judge's rulings are inconsistent—if one cannot suffer mental anguish, he likewise cannot suffer loss of enjoyment of life. For authority, they cite *McDougald v. Garber*, 73 N.Y.2d 246, 538 N.Y.S.2d 937 (1989). In *McDougald*, the plaintiff was rendered comatose through the negligence of her physician. The trial court instructed the jury that damages for loss of enjoyment of life require no awareness of the loss on the part of the injured person. 73 N.Y.2d at 253. The jury awarded $3.5 million in such damages and the Court of Appeals vacated the award, recognizing that requiring some cognitive awareness as a prerequisite to recovery for loss of enjoyment of life results in the paradoxical situation that the greater the degree of brain injury inflicted by a negligent defendant, the smaller the award the plaintiff can recover in general damages. The court then determined, however, that the temptation to achieve a balance between injury and damages has nothing to do with meaningful compensation for the victim. "Instead, the temptation is rooted in a desire to punish the defendant in proportion to the harm inflicted. However relevant such retributive symmetry may be in the criminal law, it has no place in the law of civil damages, at least in the absence of culpability beyond mere negligence." 73 N.Y.2d at 255.

Defendants recognize that the trial court, when ruling on their motion and instructing the jury, correctly anticipated this court's subsequent decision in a similar case, *Leiker v. Gafford*, 245 Kan. at 340, that: "[E]vidence of loss of enjoyment of life is definitely admissible and proper for the jury's consideration as it

relates to disability and pain and suffering, and may certainly be argued by counsel to the jury."

The facts in *Leiker v. Gafford* are similar. Shawn A. Leiker sustained personal injuries as a result of an excessive dose of spinal anesthetic while she was undergoing a Cesarean section delivery of her second child. She remained semi-comatose until her death. The personal injury and wrongful death action was brought by her husband, individually, as representative of her estate, and on behalf of their two children. The jury awarded $1,250,000 for the personal injury claim and $3,003,100 for the wrongful death claim. The trial court, as required by K.S.A. 1988 Supp. 60-1903(b), reduced the $2,000,000 award for nonpecuniary damages to $100,000.

One of the *Leiker* trial court's instructions stated in part:

"If it is necessary under the instructions and the directions on the verdict form to fix the loss on the personal injury claims of Shawn A. Leiker, you will then determine the amount of recovery. You should allow such amount of money as will reasonably compensate the Estate of Shawn A. Leiker for her injuries and losses resulting from the occurrence in question, including any of the following shown by the evidence:

a) Pain, suffering, disabilities, or disfigurement, and any accompanying mental anguish suffered by Shawn A. Leiker up to the time of her death.

b) *Loss of enjoyment of life and the capacity to enjoy life*, suffered by Shawn A. Leiker up to the time of her death." 245 Kan. at 335.

Here, the personal injury damages portion of the verdict form submitted to the jury did not set out loss of enjoyment of life as a separate element of damages. It included the nonpecuniary damages, pain and suffering, disability, disfigurement, and any accompanying mental anguish.

In *Leiker*, we first recognized that much has been written in recent years on the issue of whether damages are recoverable for loss of enjoyment of life, sometimes referred to as hedonic damages, as a separate category of damages or as a component of the more traditional categories of pain and suffering and/or disability.

The cases which have considered the issue generally fall into three categories: (1) those which totally reject loss of enjoyment of life as a consideration in awarding damages; (2) those which hold it is not a separate category of damages but may be considered as an element or component of pain and suffering and/or disability; and (3) those which hold loss of enjoyment of life

is a separate category of damages. For an excellent and comprehensive article on the subject, see Hermes, *Loss of Enjoyment of Life—Duplication of Damages Versus Full Compensation*, 63 N.D.L.Rev. 561 (1987).

One of the strongest arguments that has been advanced as a reason for not recognizing loss of enjoyment of life as a separate category of damages is that it duplicates or overlaps other categories of damages, such as permanent disability or pain and suffering. See, *e.g.*, *Huff v. Tracy*, 57 Cal. App. 3d 939, 943, 129 Cal. Rptr. 551 (1976); *Swiler v. Baker's Super Market, Inc.*, 203 Neb. 183, 187, 277 N.W.2d 697 (1979); *Flannery v. United States*, 297 S.E.2d 433, 438 (W. Va. 1982). See generally Hermes, 63 N.D.L.Rev. 561. However, loss of enjoyment of life is arguably distinct from pain and suffering. Comment, *Loss of Enjoyment of Life as a Separate Element of Damages*, 12 Pac. L.J. 965, 972-73 (1981). It is also arguably distinct from loss due to disability. In *Thompson v. National R.R. Passenger Corp.*, 621 F.2d 814 (6th Cir.), *cert. denied* 449 U.S. 1035 (1980), the court distinguished some of the different types of damages resulting from physical injury as follows:

"Permanent impairment compensates the victim for the fact of being permanently injured whether or not it causes any pain or inconvenience; pain and suffering compensates the victim for the physical and mental discomfort caused by the injury; and loss of enjoyment of life compensates the victim for the limitations on the person's life created by the injury." 621 F.2d at 824.

After acknowledging that valid arguments can be made to support all three lines of cases which have considered damages for loss of enjoyment of life in personal injury cases, we took the more realistic approach that, as a general rule, the loss of enjoyment of the pleasurable things in life is inextricably included within the more traditional areas of damages for disability and pain and suffering. While it is true that a person may recover from the physical pain of a permanent injury, the resultant inability to carry on one's normal activities would appear to fall within the broad category of disability. In the majority of cases, loss of enjoyment of life as a separate category of damages would result in a duplication or overlapping of damages. Our holding on this issue is consistent with what appears to be a slight majority

of the cases which have considered the various arguments and it is also consistent with the wording of K.S.A. 1989 Supp. 60-249a. However, we also point out that evidence of loss of enjoyment of life is definitely admissible and proper for the jury's consideration as it relates to disability and pain and suffering and may certainly be argued by counsel to the jury. *Leiker*, 245 Kan. at 340.

Under the rationale of *Leiker*, the trial court properly allowed plaintiff to argue in closing that Marquette had suffered a loss of enjoyment of life and instructed the jury that such a loss is an element of *disability, pain, and suffering.*

### The Amount of the Verdict

Finally, defendants seek either a remittitur or a new trial, claiming the verdict is excessive as a matter of law. In addition to the arguments previously made, defendants contend: (1) Marquette is not subjected to painful stimuli in the course of his daily routine; (2) the verdict was based upon overwhelming and unavoidable sympathy; (3) the verdict exceeds the total dollar amount of all plaintiffs' verdicts in medical malpractice cases in Kansas during fiscal year 1988 (see *Kansas Jury Verdicts Increase 9.5%*, 58 J.K.B.A. 7 [Feb. 1989]); and (4) 40% of the verdict, or $3.7 million, will be used to pay attorney fees.

The defendants state that major shortcomings of the present tort system have led to calls for statutory limitations, constitutional amendments, and complete abolition of a fault-based system of recovery. Defendants argue:

"The time has come for this Court to seize the opportunity to utilize the information from itemized verdicts and exercise its power of remittitur to restore common sense and fiscal responsibility to personal injury verdicts. By so doing, this Court can send a message to the trial bench, the bar, and the public that it is embarking upon a new era in tort jurisprudence which ensures protection of both plaintiffs and defendants and the preservation of a fault based system of compensation. . . . This Court can and must act to restore the faith of the public, the business community and the insurance industry in the tort system as a responsible and responsive system of compensation. To do so, you must reduce this verdict to appropriate levels, or remand this case for new trial with appropriate instructions which will tell the trial court and the world at large that Kansas is now to be in the forefront of responsible jurisprudence."

In part, the defendants ask that we make an economic decision rather than answer a legal question. They request this court to exceed its role under our state constitution and legislate a new tort system. Economic decisions are for the legislature, not the judiciary. Under our constitution and the separation of powers doctrine, the legislature has limited power to modify the common-law tort system. If the legislature chooses to exercise its limited power, the court does not stand as a buffer between the people and the legislature, but determines the legality of the legislature's act under our constitution. We will follow our constitutional role and examine the amount of the verdict.

Where a charge of excessive verdict is based on passion or prejudice of the jury but is supported solely by the size of the verdict, the trial court will not be reversed for not ordering a new trial, and no remittitur will be ordered, unless the amount of the verdict in light of the evidence shocks the conscience of the appellate court. *Smelko v. Brinton,* 241 Kan. 763, 771, 740 P.2d 591 (1987). After reviewing the evidence and the judge's instructions, the amount of the jury's verdict does not shock the conscience of this court.

The judgment of the district court is affirmed.

McFARLAND, J., concurring: I agree with the following concurring opinion authored by Justice Six. Two aspects of the circumstances involved in the annuity in question particularly concern me. There was no evidence as to how the six percent per year increase in the payments was determined or whether or not it was a realistic figure in view of the skyrocketing increase in health care costs experienced in the last few years. Also, the very short life of the offer to sell the annuity at the specified price would expire before there was any realistic possibility that the conservator would have the funds with which to purchase the annuity. An additional delay would arise from the conservator's performance of her duty to explore the annuity market, to receive competitive bids thereon, and to determine the prudent action to take. Further, judicial review of the judgment is, by itself, a significant delaying factor.

Under the circumstances, the annuity offer herein was not evidence of what amount of money would be needed to meet the injured party's future cost of medical care and maintenance.

Six, J., concurring: I concur with the result reached by the majority that, under the facts of this case, the trial court properly excluded the hearsay testimony of the expert witness. In my view, we are not, by our ruling in this case, establishing a per se rule excluding evidence concerning the cost of an annuity insurance contract to pay future medical expenses. I join the majority as to the remainder of its decision.