BYRON J. HOLSTON *et al.*, Co-Adm'rs of the Estate of Theodora Holston, Deceased, Plaintiffs-Appellees, v. SISTERS OF THE THIRD ORDER OF ST. FRANCIS, Defendant-Appellant.

First District (3rd Division)   No. 1—88—2618

Opinion filed February 24, 1993.—Rehearing denied July 15, 1993.

Francis D. Morrissey, Norman D. Barry, Jr., and Thomas W. Cushing, all of Baker & McKenzie, of Chicago, for appellant.

Albert F. Hofeld and Howard Schaffner, both of Chicago, for appellees.

JUSTICE CERDA delivered the opinion of the court:

One of the defendants, the Sisters of the Third Order of St. Francis (defendant), which was the owner and operator of St. Anthony Medical Center, appeals after a jury trial in which plaintiffs, Byron J. Holston and Heather L. Holston, co-administrators of the estate of Theodora Holston (decedent), were awarded $7.3 million in their medical malpractice action. Defendant argues that: (1) the trial court erred in denying its motion to transfer venue to Winnebago County; (2) in violation of Supreme Court Rule 220 (134 Ill. 2d R. 220), the trial court improperly allowed plaintiffs' expert, Dr. Alden, to testify regarding opinions that were not provided to defendant before trial; (3) the trial court erred in barring Susan Burns from testifying as to the standard of care for nurses; (4) the jury should not have been instructed to consider conscious pain and suffering, disability, and disfigurement because there was no evidence of these damages; (5) the trial court erred in barring evidence of the separation of

decedent and her husband 18 months prior to her death; and (6) the jury verdicts were excessive. We affirm.

Plaintiffs' first complaint for wrongful death and survival named the following defendants: The Rockford Surgical Service, S.C., a corporation; Dr. Edward H. Sharp; R. Glenn Smith; Dr. George Arends, individually and d/b/a Rockford Anesthesiology Group; John Szewczyk, individually and d/b/a Rockford Anesthesiology Group; St. Anthony Hospital; the Sisters of the Third Order of St. Francis, a not-for-profit corporation; Christine Carlson; K. Flatley; Donald E. Bonicki; C.R. Bard, Inc. (Bard); Becton, Dickinson and Company, a corporation; Bard Parker, a division of Becton, Dickinson and Company, a corporation (Bard Parker); Bard Consumer Products (Bard Consumer); Bard Home Health Division, a division of Bard (Bard Home); The Burrows Company, a corporation; and Ginders Hospital Supply Co., a corporation. Bard, Becton, Bard Parker, Bard Consumer, Bard Home, Burrows, and Ginders allegedly designed, manufactured, distributed, and sold to defendant a central venous pressure (cvp) catheter that was defective and unreasonably dangerous.

Rockford Surgical filed a motion for dismissal or for transfer of venue to Winnebago County because of the existence of an identical action in Federal court, because the cause of action arose in Winnebago County, and because all defendant doctors resided and practiced in Winnebago County. This motion and other defendants' motions for change of venue were denied.

Plaintiffs' fourth amended complaint alleged in count I against defendant that: (1) St. Anthony owned and operated the hospital in Rockford; (2) decedent was admitted to the hospital on January 9, 1978, under the care of Dr. Sharp, who performed gastric bypass surgery on her on January 12, 1978; (3) Dr. Arends was the anesthesiologist for decedent's surgery and placed a cvp catheter in her; (4) the cvp catheter penetrated decedent's heart on January 12, 1978, resulting in an atrial perforation; (5) the cvp catheter delivered intravenous fluid through the atrial perforation into the pericardial sac surrounding decedent's heart, resulting in a condition of cardiac tamponade; (6) as a result of the cardiac tamponade, decedent suffered cardiac arrest, which resulted in permanent brain damage; (7) defendant was negligent because: (a) although the nurse caring for decedent believed that she should be seen by a physician immediately, the nursing supervisor refused to allow the nurse to notify Dr. Sharp and failed to notify a physician herself; (b) when standard nursing practice required that a physician be notified concerning decedent's vital signs, defendant failed to notify a physician in a timely manner;

and (c) defendant failed to adequately care for decedent; and (8) as a result of defendant's negligence, decedent became injured and sustained conscious pain and suffering, disability, and disfigurement until she died on January 19, 1978. Count I sought damages of $1.5 million.

Count II was for wrongful death based on the negligence alleged in count I, and it further alleged that decedent's husband Byron C. Holston, son Byron J. Holston, and daughter Heather L. Holston sustained substantial pecuniary loss, loss of services and consortium, and severe damage by reason of decedent's death. Count II sought damages of $8.5 million.

Plaintiffs made a motion *in limine* barring testimony regarding decedent's separation from her husband. Plaintiffs' attorney argued at the hearing that they were separated about 1½ years prior to decedent's death, that they did not consult a lawyer, that it was not a formal separation, that they were separated for four to six months, that they saw a marriage counselor, and that they were reunited. The trial court orally ruled that the incident was not relevant to the quality of the marriage on the date of decedent's death and was prejudicial.

The testimony that is relevant to the issues raised on appeal is summarized below.

Dr. Sharp testified for plaintiffs as an adverse witness to the following. Decedent was morbidly obese and her gastric bypass operation was performed to reduce her weight. No abnormality in her heart was noted before the surgery. Dr. Arends, the anesthesiologist, placed a cvp catheter in decedent for the gastric bypass surgery. The purpose was to monitor the fluid shifts. No complications were revealed to Dr. Sharp during the surgery, and decedent's heart did not suffer any trauma during the surgery.

After the surgery, decedent was taken to the intensive care unit. Her vital signs were monitored in the afternoon. One of the vital signs was pulse, and tachycardia was a rapid heart beat, which could be one of the signs of cardiac tamponade. Other signs of cardiac tamponade were increased cvp and a drop in blood pressure. Decedent's pulse rate was 78 at 1:30 p.m, 94 at 2 p.m., and 120 at 2:30 p.m. A pulse of 120 one hour after surgery if a patient was awake and feeling pain was not unreasonable. Decedent's pulse, blood pressure, and respiration rates were within normal limits up to 5 p.m. Her blood pressure and cvp were within the range of normal at 5 p.m. At 5 p.m., decedent was repositioned to her left side, and she was given a

rubber glove to blow up for a medical reason. These activities could have increased the heart rate.

Compared to earlier measured blood pressure recordings, decedent's blood pressure of 100/60 at 5 p.m. was within the normal range. The only arguably significant or abnormal vital sign at 5 p.m. was the 140 pulse, and Dr. Sharp would have wanted to know about it. Her pulse rose to 148 at 6 p.m. Dr. Sharp received a telephone call at 6:20 p.m., when her pulse was 166 and her cvp was 22.

Dr. Sharp arrived at decedent's bedside at 6:43 p.m. He said something to decedent, and she squeezed his hand but he did not think she was able to speak because of the presence of an endotracheal tube. She was awake enough that he felt she had a functioning brain. He did not recall, but thought that decedent was still conscious when she was taken to the operating room to have an exploratory laparotomy. He did not think that she then would have been able to respond to pain, but this question was in the area of neurology. No anesthesia was given to her when he opened her abdomen in the second operation, but he did not think that she experienced any pain.

In the second operation, Dr. Sharp found no bleeding to account for decedent's condition. Decedent had a cardiac arrest, and he had to perform an emergency left thoractomy, in which he severed the tissue in her left chest. Her heart stopped for slightly over five minutes. He squeezed her heart to help return some blood flow to her brain. The heart did not feel normal because of a large amount of fluid around it in the sac. He made a small opening and about 100 or 200 cubic centimeters (cc) of fluid came out. From 1 to 7 p.m., she had received intravenous (iv) fluid at the rate of 100 cc per hour. Her heart started to beat after the fluid was relieved. He felt the cvp catheter within the right atrium. Decedent never regained consciousness.

A patient would experience pain after the gastric bypass operation upon awakening from anesthesia. Gastric bypass surgery caused a tightening of the muscles that was a response to pain. The cvp would rise as a result because the pressure within the abdomen rises. Decedent was resting comfortably at 4 p.m., yet her cvp was up from the previous hour. There was nothing in the nurse's notes to indicate that she was in pain from 5 to 6 p.m. She was given medicine at 3:30 p.m. for her complaint of abdominal pain. At 6 p.m., she was complaining of abdominal discomfort. Decedent was so large that she would have had tremendous pain after the surgery. It did not mean that she had no pain if there was never a notation of pain from the

time she arrived in the intensive care unit until after the second surgery. It was possible that a patient could have pain and the nurse would not record it because it was expected.

On January 25, 1988, plaintiffs' attorney stated that plaintiffs' expert, Dr. Alden, had no criticism of the hospital when he gave his deposition because Dr. Maxwell had testified at his own deposition that he was called to the hospital around 4:55 p.m. Plaintiffs' attorney stated that Dr. Maxwell was going to testify that he was not called to the hospital or did not get to the hospital until around 6:20 or 6:30 p.m. and that, therefore, Dr. Alden might have an additional criticism against the hospital. The trial court indicated that the information was new to plaintiffs and that plaintiffs should give defendant "some idea" of how the expert would testify.

Susan Burns testified as an adverse witness for the plaintiffs that on January 12, 1978, she was the head nurse of the special care unit. She went off duty at approximately 3:30 p.m., but she remained in the hospital to work on scheduling. She was at decedent's bedside just prior to the second surgery.

Dr. Paul Maxwell testified that he was the cardiologist called to decedent's bedside when she was in critical condition at about 6:30 p.m. He tried to stabilize her prior to Dr. Sharp's arrival. If a nurse felt at 5 p.m. that decedent's vital signs were abnormal, she should have called a doctor. If he had been called at 5 p.m., among the diagnoses he would have considered was cardiac tamponade, but the vital signs at 5 p.m. could have been consistent with a normal post-operative course. A number of tests could have been performed at 5 p.m., and a diagnosis of cardiac tamponade could have been made before 6 p.m. Many patients with cardiac tamponade complained of chest pain, but it was not noted in the chart that decedent complained of anything other than abdominal pain. Abdominal pain was more consistent with bleeding than with cardiac tamponade.

The videotaped evidence deposition of Christine Carlson was presented. She testified to the following. The charge nurse was responsible for the patient care and the activities in the special care unit. Burns was the charge nurse for the prior shift, and Pam Markin was the charge nurse for Carlson's shift. Markin assigned Carlson to decedent. Carlson went to decedent's bedside to receive a report from Nurse Flatley, who was going off duty. She noticed from the chart that decedent's pulse was in the 70's after surgery and that within a two- or three-hour period it had risen to 120. Decedent's cvp was 9 when Carlson arrived.

At 4 p.m., decedent was resting comfortably and was not restless, and Carlson noted that her pulse was 120 to 124. She felt that this was a significant rise in pulse and that something was going on. Carlson expected the pulse to be relatively within the baseline parameters after she came back from surgery, especially after decedent had been given analgesia for pain. She also noted that decedent was pale and that her heart sounds were distant.

Carlson further testified that at 4:45 p.m., decedent's pulse was between 120 and 140. On a third request, Markin came, and Carlson told her that she was concerned about the cvp and pulse rates and that the urine output was marginal. She told Markin that she was certain that decedent was in the early signs of cardiac tamponade and that if Dr. Sharp were called he could evaluate the situation. Markin found no basis for cardiac tamponade and did not think that Dr. Sharp needed to be called. Markin told Carlson to watch decedent because she expected a lowering blood pressure with tamponade. Carlson said she did not want to wait until that point.

Carlson spent a lot of time trying to calm decedent, who wondered why Carlson was leaving the bedside and talking so much to the other nurse. At 5 p.m., decedent's pulse had risen to 140, the cvp had risen to 11, and the urinary output had dropped from 70 cc to 20 cc. Carlson would have expected her urinary output to be at least 70 cc an hour. She told Markin that the pulse and cvp had climbed and that the urinary output had dropped. At 5 p.m., the situation was very serious and Dr. Sharp should have been called. Markin said that she would make the decision whether Dr. Sharp needed to be called and that there was no evidence of tamponading.

No doctors had seen decedent from 4 to 6 p.m. At 6 p.m., decedent's pulse was up to 150, her systolic blood pressure was starting to fall, her cvp had risen to 16, and she did not have a urinary output. Her color was a little paler than at the beginning of Carlson's shift.

Carlson further testified that decedent's condition deteriorated very rapidly from 6 to 6:15 p.m. At 6:15 p.m., decedent's pulse was up to 160 and her cvp was 22. It was very difficult to measure the blood pressure because it was so low. At 6:20 p.m., there was no diastolic blood pressure, and decedent was slow to respond. At 6:30 p.m., Carlson could not get a blood pressure reading, and decedent was only able to open her eyes, squeeze Carlson's hand, and speak in a whisper.

Carlson tried to calm and reassure decedent. When decedent began decompensating in her pressure, she looked anxious and asked

Carlson what was going on. Decedent lost her blood pressure and became unconscious when she "coded" at 6:15 or 6:20 p.m. Several persons arrived at the bedside. Dr. Sharp was called at 6:20 p.m., and Carlson saw him at the bedside at 6:43 p.m., but he may have arrived there sooner.

Carlson further testified that decedent was taken to surgery as quickly as possible, at 6:50 p.m. Carlson told her that she was being taken to surgery because some fluid in her chest had to be relieved. She did not lose consciousness on the way to surgery. Decedent was brought back to the special care unit at 9 p.m., at which point there was no response to verbal or pain stimuli.

Prior to the testimony of Dr. John F. Alden, defendant moved that the testimony of plaintiffs' expert should be barred because of the untimeliness of plaintiffs' notification that the expert was going to offer additional opinions against his client after his deposition. The motion was denied.

Dr. Alden testified about his qualifications as a surgeon, including that he was one of the pioneers of gastric bypass surgery. His opinion was that the cause of decedent's death and brain damage was pericardial tamponade resulting from a perforation of the right atrium by an improperly positioned catheter. The perforation occurred at 4 p.m. or earlier because the vital signs began to change then. The diagnosis and treatment of cardiac tamponade in this case did not conform to the standard of practice. The standard of practice would have been to place the tip of the catheter into the superior *vena cava* above the pericardial sac and afterwards to confirm the location by a chest X ray. An X ray would have shown that the catheter tip was in the atrium.

Over an overruled objection based on a violation of Supreme Court Rule 220 (134 Ill. 2d R. 220), Dr. Alden testified that his opinion was that a doctor should have been called at 5 p.m. because decedent's condition had changed. The symptoms were clear, and the diagnosis could have been made at 5 p.m. There was a deviation from the standard of care when no doctor was called between 5 and 6 p.m. The symptoms of cardiac tamponade were clear at 6 p.m.

Dr. Alden further testified that at 6:20 p.m., the most likely diagnosis was pericardial tamponade, but neither the surgeon nor the cardiologist made the correct diagnosis. A needle could have been used to determine if fluid was present, and the fluid could have been withdrawn with the needle. Relieving the cardiac tamponade would have saved decedent's life.

Dr. Alden saw Carlson's deposition for the first time several nights prior to the date of testimony. He learned for the first time reading Carlson's deposition that there was a suggestion that the attending nurse was prevented from getting a doctor. Although he testified in his deposition that the nursing care did not deviate from the standard of care, his opinion now was that a nurse deviated from the standard of care.

Jeff Beichner testified that he was a nurse who had worked as an intravenous therapist with cvp lines. He also had experience in working with post-surgical patients and cardiac patients and in teaching nursing. Beichner would have been concerned about the rise in decedent's heartbeat from 94 at 2 p.m. to 120 at 2:30 p.m. The pulse rate at 3:30 p.m. also would have concerned him. At 5 p.m., decedent was having some pain, but it would have taken a significant torture-like pain to cause a heart rate of 140. The nursing personnel had a duty to contact the doctor at 5 p.m. even if everything was normal other than the urinary output of 20 cc or the pulse rate of 140. It was the standard of care to notify the doctor when the urinary output fell below 30 cc, even if the surgeon's standard was no notification unless the output fell to 15 cc.

Dr. Frank Edward Robbins, Jr., testified to the following. He was an anesthesiologist who had taught anesthesiology at medical school. The catheter placement in this case was not within the standard of practice because a chest X ray was not obtained and proper placement was not confirmed. The person who inserted the catheter had the primary responsibility to confirm proper placement, and the anesthesiologist did not obtain a chest X ray. This responsibility was also shared by the surgeon.

Byron Holston testified that he was 20 years old and decedent was 17 years old when they were married. When decedent was hospitalized, they had been married 12 years and their children, Byron and Heather, were ages 12 and 8, respectively. Decedent was 29 years old when she died.

Plaintiff introduced into evidence vital statistics of the 1980 United States life tables, which stated that the life expectancy of a 29-year-old female was 50.6 years.

Plaintiffs rested their case.

Dr. Arends testified for defendant that there had been no cases in the literature of cardiac tamponade following internal jugular placement of this catheter. The risks of cardiac tamponade posed by the insertion of the catheter in decedent were infinitesimal.

On February 8, 1988, the court was advised that plaintiff settled with Dr. Arends, Dr. Sharp, Rockford Anesthesiologists, and Dr. Maxwell. In addition, defendant moved for a mistrial and a transfer of venue to Winnebago County. After the close of plaintiffs' case, defendant moved for a mistrial and for a transfer of venue to Winnebago County. The motions were denied.

Dr. Sharp testified that it was very possible that if a doctor had been contacted at 5 p.m., he would have been able to run the necessary tests and diagnose cardiac tamponade. He should have been notified at 5 p.m. by the hospital.

Plaintiffs voluntarily dismissed Dr. Endres, Carlson, Dr. Maxwell, Rockford Cardiology, Dr. Sharp, Dr. Arends, Rockford Surgical, and Rockford Anesthesiologists, with prejudice. In addition, plaintiffs voluntarily dismissed Bard without prejudice. Defendant's motion for directed verdict was denied.

On the basis that Susan Burns had not been disclosed as an expert, she was barred from testifying about the standard of nursing care but was permitted to give expert opinions from the time that she was involved with the patient as a treater. Burns testified that, assuming that Carlson saw a problem with her patient and advised her supervisor instead of contacting the doctor, she should have contacted the doctor first.

The following offer of proof of Burns' testimony was made. She was familiar with the standards of nursing practice applicable to nursing care as they existed in the Rockford area in January 1978. Her opinion was that there was no need to notify a doctor at 4 or 5 p.m. because the patient's vital signs were stable.

Jury instructions on conscious pain and suffering, disability, and disfigurement were given over defendant's objection.

The jury awarded on count I $600,000 for decedent's pain and suffering and $400,000 for decedent's disability and disfigurement. The jury awarded on count II $5 million for the loss of society, companionship, and services suffered by decedent's son and daughter, $1.2 million for the loss of society, companionship, and services suffered by decedent's husband, and $100,000 for the loss of money and goods suffered by decedent's son, daughter, and husband. The total verdict for count I was $1 million, and the total verdict for count II was $6.3 million.

Defendant filed a post-trial motion, which was denied.

Defendant first argues on appeal that the trial court erred when it denied its motion to transfer venue from Cook County to Winne-

bago County because, *inter alia*, plaintiffs made no effort to establish a *prima facie* case against Bard.

■ Defendant did not renew the motion at the close of all the evidence as required by the Illinois Code of Civil Procedure. (Ill. Rev. Stat. 1991, ch. 110, par. 2—105; *Young v. Cerniak* (1984), 126 Ill. App. 3d 952, 963, 467 N.E.2d 1045 (motion for transfer of venue was renewed at close of plaintiff's case but was not renewed at close of all the evidence and, therefore, issue was not presented for review).) According to the 1955 Joint Committee Comments to section 2—105, the requirement for renewal of the motion was "designed to permit a review of the issue of good faith and probable cause on the basis of the entire record, and not simply on the record up to the point at which the earlier motion to transfer had been denied." (Ill. Ann. Stat., ch. 110, par. 2—105, Joint Committee Comments, at 103 (Smith-Hurd 1983).) Therefore, the denial of defendant's motion to transfer venue was waived as a ground for reversal.

Defendant next argues that the trial court improperly allowed Dr. Alden to testify regarding opinions concerning defendant's deviation from the standard of care that were not provided to defendant before trial in violation of Supreme Court Rule 220 (134 Ill. 2d R. 220). Defendant argues that Dr. Alden was critical of the nurses for the first time at trial, but defendant does not specify which opinions were new.

■ Excerpts from Dr. Alden's deposition were read by plaintiffs' counsel during a side bar, but it is not part of the record. The record is not adequate to determine whether the expert testified to new opinions at trial. Although Dr. Alden testified at trial that he had testified in his deposition before trial that the nurses did not deviate from the standard of care, the excerpts read by plaintiffs' counsel indicated that Dr. Alden was critical of the nurses' failure to contact a doctor. Dr. Alden's trial testimony that he did not testify at his deposition that the nurses deviated from the standard of care conflicts with the deposition testimony excerpts read by plaintiffs' counsel. Rather than accepting Dr. Alden's recollection of his deposition testimony, the entire deposition testimony itself would have to be reviewed in order to determine whether Dr. Alden's opinions at trial were inconsistent with his previously disclosed opinions. As it was the appellant's burden to present this court with an adequate record (*Venturini v. Affatato* (1980), 84 Ill. App. 3d 547, 552, 405 N.E.2d 1093), the issue cannot be addressed.

Defendant next argues that the trial court misapplied Supreme Court Rule 220 by barring Burns from testifying about the standard

of care for nurses because, as the head nurse in charge of the special care unit, she was a medical treater of the patient and was therefore immune from the disclosure requirements. Plaintiffs respond that Burns was not a treater because she did not see the patient until after she became unconscious.

Supreme Court Rule 220 provides a definition of expert witness:

"An expert is a person who, because of education, training or experience, possesses knowledge of a specialized nature beyond that of the average person on a factual matter material to a claim or defense in pending litigation and who may be expected to render an opinion within his expertise at trial. He may be an employee of a party, party, or an independent contractor." (134 Ill. 2d R. 220(a)(1).)

The rule provides for disclosure of certain expert witnesses:

"In order to insure fair and equitable preparation for trial by all parties the identity of an expert *who is retained to render an opinion at trial* on behalf of a party must be disclosed by that party either within 90 days after the substance of the expert's opinion first becomes known to that party or his counsel or, if the substance of the expert's opinion is then known, at the first pretrial conference in the case, whichever is later." (Emphasis added.) 134 Ill. 2d R. 220(b)(1).

Rule 220(b)(1) has been interpreted by the Illinois Supreme Court as requiring the disclosure of the identity and opinions only of those witnesses who are "engaged" for the purpose of giving an expert opinion at trial. (*Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 231, 528 N.E.2d 978.) The court also held that treating doctors were not expert witnesses within the meaning of the rule because they were consulted for medical treatment. (*Tzystuck*, 124 Ill. 2d at 231.) At trial, treating doctors could give opinions that were developed in the course of medical treatment and were completely apart from any litigation. (*Tzystuck*, 124 Ill. 2d at 231.) Those opinions were not formed in anticipation of a trial but were the product of a doctor's observations while treating the patient and were similar to those of occurrence witnesses who also were not retained but who testified because they witnessed or participated in the events. (*Tzystuck*, 124 Ill. 2d at 234-35.) In addition, the purpose of the rule was to facilitate trial preparation and the evaluation of claims by eliminating the late or surprise disclosure of experts at trial. (*Tzystuck*, 124 Ill. 2d at 238.) The testimony of a treating doctor should not be surprising; the identify of treating doctors is discoverable, and under

Supreme Court Rule 204 (134 Ill. 2d R. 204), a court order may be sought for a deposition. *Tzystuck*, 124 Ill. 2d at 238.

Plaintiffs rely upon *Greene v. Rogers* (1986), 147 Ill. App. 3d 1009, 1018, 498 N.E.2d 867, in which it was held that a pathologist, who had performed an autopsy of plaintiff but was not hired by plaintiff and who had testified regarding the alleged malpractice of the hospital, was an expert who should have been disclosed by plaintiff prior to trial. The court noted that the pathologist's only factual involvement in the case was performing the autopsy and that, because he was not involved in the emergency room treatment of plaintiff and lacked actual knowledge, he could not testify to the care as a mere factual witness. *Greene*, 147 Ill. App. 3d at 1017.

Similar in reasoning is *Hatch v. Golden Rule Insurance Co.* (1990), 204 Ill. App. 3d 790, 794, 796, 562 N.E.2d 623, which held that a witness in a breach of insurance contract case was an expert because he was an employee of defendant who had not been involved in the facts of the case until he was asked to testify. The identity of the witness was unknown to plaintiffs until he was called to testify, and therefore he was not intimately involved with the subject matter of the litigation. *Hatch*, 204 Ill. App. 3d at 796.

In contrast is *Dugan v. Weber* (1988), 175 Ill. App. 3d 1088, 1093, 530 N.E.2d 1007, which held that it was the doctor's relationship to the case and not the substance of his testimony that qualified him as a Supreme Court Rule 220 expert. A treating doctor, who had not examined plaintiff in over two years at the time of the trial in the medical malpractice case, examined plaintiff on the evening of trial for the purpose of reinforcing his opinion as to plaintiff's disability. Defendant argued that the substance of the treating doctor's expert testimony at trial, particularly his opinion regarding the extent of plaintiff's disability and whether defendant deviated from the acceptable standard of care, transformed him into a Supreme Court Rule 220 expert. Unlike *Greene* (147 Ill. App. 3d 1009, 498 N.E.2d 867), which required disclosure under the rule of testimony of an expert who had not been retained, *Dugan* held that the rule required disclosure of only those expert witnesses whose relationship with the litigant arose solely because the doctor was retained to render an opinion at trial. (*Dugan*, 175 Ill. App. 3d at 1093.) No disclosure was necessary. *Dugan*, 175 Ill. App. 3d at 1093.

Occurrence witnesses who had direct involvement in the subject matter of the litigation and whose opinion testimony was not merely prepared in anticipation of trial do not need to comply with the Supreme Court Rule 220 disclosure requirements. *Forest Preserve Dis-*

*trict v. Brookwood Land Venture* (1990), 199 Ill. App. 3d 973, 981, 557 N.E.2d 980.

Cases have also held that persons who, although not occurrence witnesses, were intimately involved in the matter being litigated, were employed by a party when the cause of action arose, were known to the parties long before trial, and were equally available to all parties for the purposes of discovering his testimony, are not subject to the Supreme Court Rule 220 disclosure requirements. (*E.g., First National Bank v. Village of Mt. Prospect* (1990), 197 Ill. App. 3d 855, 863-64, 557 N.E.2d 1257 (witness in action seeking disconnection of property from village was not required to be disclosed where he was defendant's former director of planning and zoning and its former village planner); *Voyles v. Sanford* (1989), 183 Ill. App. 3d 833, 539 N.E.2d 801 (witness in personal injury suit arising out of collision was former employee of one defendant); *Smith v. Central Illinois Public Service Co.* (1988), 176 Ill. App. 3d 482, 531 N.E.2d 51 (project manager of one of the defendants was permitted to give his opinion on the safety of system involved at plant where plaintiff was injured).) The rationale was that the identity of the witness was not a surprise (*Smith*, 176 Ill. App. 3d at 494-95) and that the witness had not been retained as an expert for the purpose of litigation (*Voyles*, 183 Ill. App. 3d at 836-37; *Smith*, 176 Ill. App. 3d at 495).

■ Nurse Burns was not hired by defendant or otherwise retained solely to give an opinion at trial. She was an occurrence witness to a part of defendant's medical treatment of decedent. Therefore, she need not have been disclosed as an expert under the rule. In addition, it would not have been unfair for Burns to testify about the standard of care for nurses because her identity was obviously known to plaintiffs, who called her as an adverse witness. Plaintiffs could have deposed Burns as to the existence of any opinions about defendant's compliance with the standard of care.

The next issue concerning Burns is the harm of the error in barring her testimony that there was no need to notify a doctor at either 4 or 5 p.m. because decedent's vital signs were stable. Generally, a jury verdict will not be reversed because of error in the admission of evidence unless there has been a denial of real justice. (*Atkins v. Thapedi* (1988), 166 Ill. App. 3d 471, 477, 519 N.E.2d 1073.) An erroneous ruling on evidence is harmless where the result reached was not affected by the ruling and was the only one warranted by other evidence in the case. (*Atkins*, 166 Ill. App. 3d at

477.) In addition, the burden is on the party seeking reversal to establish prejudice. *Atkins*, 166 Ill. App. 3d at 477.

Defendant does not argue how it was prejudiced by this error, but a review of the testimony on the subjects about which Burns was barred from testifying shows that the error was harmless.

The relevant testimony can be summarized as follows. The surgeon and both of plaintiffs' retained experts (a surgeon and a nurse) testified that a doctor should have been notified at 5 p.m. The nurse who cared for decedent after the surgery wanted to contact the doctor as early as 4:45 p.m. The cardiologist testified that only if a nurse felt that the vital signs were abnormal should the doctor have been called at 5 p.m. but that the vital signs could have been considered normal at that time. Not only were there three persons who believed that a doctor should have been called at 5 p.m., as opposed to one or two persons who did not believe a doctor should have been called (Burns and possibly the cardiologist, depending on how his testimony is categorized), but one of the three persons was decedent's treating doctor.

The issue of whether a doctor should have been called was important to plaintiffs' case because plaintiffs' theory was that, in addition to having failed to monitor the placement of the catheter after surgery, defendant failed to treat decedent for cardiac tamponade. Burns did not treat decedent at 4 or 5 p.m., so her opinion on whether a doctor should have been notified at those times had weight equal to an opinion of one of the two expert witnesses, who also based their opinions solely on the medical records. The admission of Burns' testimony would have been the addition of one expert opinion that the doctor need not have been notified. But it is unlikely that this barred testimony would have swayed the jury to find that a doctor need not have been called when the treating doctor himself testified that he would have wanted notification.

Defendant next argues that the jury should not have been instructed to consider conscious pain and suffering as an element of damages because: (1) there was no evidence that decedent experienced any conscious pain and suffering from cardiac tamponade and because the abdominal pain was a natural result of the surgery; (2) there was no evidence that decedent's anxiety was caused by the cardiac tamponade; and (3) the only compensable mental pain is that directly resulting from physical pain.

The following summarizes the relevant testimony concerning decedent's pain and suffering. Dr. Sharp testified to the following. At 6 p.m., decedent was complaining of abdominal discomfort, which was

probably a result of the surgery. Decedent would have been expected to have tremendous pain because of her large size. When he arrived at decedent's bedside at 6:43 p.m., her brain would have been functioning. But he did not recall whether she was still conscious when she reached the operating room. He did not think that she experienced any pain as the second surgery began.

Carlson testified to the following. Decedent lost her blood pressure and became unconscious when she "coded" at 6:15 or 6:20 p.m. But Carlson also testified at another point that decedent had not lost consciousness on the way to surgery. When decedent began decompensating in her pressure, decedent looked anxious and asked Carlson what was going on. Carlson told her that there was a problem with her blood pressure and reassured her that the doctor was coming. As decedent was being wheeled to surgery, Carlson told decedent that she was being taken to surgery because some fluid in her chest had to be relieved. Decedent said that she was "okay basically."

Beichner testified to the following. A patient awakening from surgery would experience some anxiety, but decedent's anxiety would have been less because she was a nurse. Decedent experienced some pain at 5 p.m., but it would have taken a significant torture-like pain to have caused a heart rate of 140.

Defendant relies upon *Chicago City Ry. Co. v. Anderson* (1899), 182 Ill. 298, 555 N.E. 366, a personal injury suit involving back injuries, in which defendant objected to a jury instruction on pain and suffering. The court held that: (1) mental pain from "the contemplation of a maimed body" was too remote to be an element of damages; (2) the mental pain that could be considered in "this class of cases" was that suffered as the direct result or concomitant of the physical pain; and (3) mental pain that was the direct and necessary result of the physical pain, but not otherwise, was a proper element of damages. (*Chicago City*, 182 Ill. at 300.) The court did not specifically state that mental pain resulting from physical suffering other than physical pain was not a proper element of damages.

Other Illinois authorities have held that compensable mental suffering is that resulting from physical injury, but it is not clear whether these cases encompassed nonpainful physical injury. *North Chicago St. R.R. Co. v. Lehman* (1899), 82 Ill. App. 238, 239 (mental pain is a proper element of damage when it arises directly out of and is a part of the physical suffering that is endured as the result of an injury); *Garvey v. Metropolitan West Side Elevated R.R. Co.* (1910), 155 Ill. App. 601, 603 (mental suffering is a proper element of dam-

ages when it is directly traceable to the injury suffered); *Horan v. Klein's-Sheridan, Inc.* (1965), 62 Ill. App. 2d 455, 211 N.E.2d 116 (damages could be recovered for pain and anguish of mind caused by burns); *Duncan v. Martin's Restaurant* (1952), 347 Ill. App. 183, 106 N.E.2d 731 (plaintiff could recover for pain and mental anguish as a consequence of the injury and miscarriage).

C.J.S. states that compensable is mental pain and suffering that is a direct and necessary consequence of a physical *injury*, and the treatise does not restrict mental pain to only that resulting from physical *pain*. (25 C.J.S. *Damages* §65 (1966).) Among the possible forms of mental suffering are fright, shock, and anguish, but mere anxiety of mind that is unconnected with bodily injury is generally noncompensable. 25 C.J.S. *Damages* §70 (1966).

According to 22 Am. Jur. 2d *Damages* §251 (1988), mental anguish in a personal injury action covers the pain associated with the injury, the mental reaction to that pain, *and* the mental reaction to the possible consequences of the injury. One could recover for anxiety accompanying physical injury, reasonable anxiety about the consequences of the tort, apprehension of future disease, disability or paralysis, or fear about future surgery. (22 Am. Jur. 2d *Damages* §254 (1988).) One could also recover for mental depression as a consequence of personal injury. 22 Am. Jur. 2d *Damages* §253 (1988).

■ We hold that mental suffering caused by physical injury even without pain is compensable. Plaintiffs did not clearly prove that decedent suffered pain as a result of the cardiac tamponade and the subsequent emergency surgery, but the reasonable inference from the evidence of increasing pressure on the heart, rising pulse rate, and declining blood pressure was that decedent suffered more than she would have in a normal post-operative course. An award for decedent's suffering was appropriate.

We also hold that it was not reversible error to instruct the jury to consider conscious pain as an element of damages. Plaintiffs argue that it was possible that decedent was conscious when she arrived in the operating room. Although the award was combined for both pain and suffering, the jury could have properly awarded $600,000 for decedent's suffering alone. That award is therefore affirmed.

Defendant next argues that the trial court erred in instructing the jury on disability as an element of damages because there was no evidence that decedent suffered any disability. Defendant also argues that plaintiffs should not have been awarded nonpecuniary damages for disability for the time that decedent was comatose and uncon-

scious because nonpecuniary loss should be measured by the impact of the loss on the injured person's psyche.

Plaintiffs respond that decedent suffered brain damage that caused a coma from which she never recovered and that the coma resulted in decedent becoming totally disabled.

Defendant relies on the following cases. In *Paladino v. Campos* (1976), 145 N.J. Super. 555, 559, 368 A.2d 429, 431, plaintiff's heart attack was not diagnosed in time, and the court rejected plaintiff's argument that he should be compensated for the unlived portion of his normal life expectancy. The court held that the value of the period of unlived life was immaterial because nonpecuniary loss must be measured by the impact of the loss on the injured person's psyche. (*Paladino*, 145 N.J. Super. at 557-58, 368 A.2d at 430.) The court referred to cases which applied the rule that compensation for nonpecuniary losses must be based on an awareness of the loss. *Paladino*, 145 N.J. Super. at 558, 368 A.2d at 430.

In *Flannery v. United States* (4th Cir. 1983), 718 F.2d 108, plaintiff became permanently comatose as a result of brain damage. The court stated that under the Tort Claims Act (28 U.S.C. §2674 (1988)) damages were generally determinable under State law and that the United States was to be held liable to the same extent as a private individual under similar circumstances, except punitive damages were not allowable. (*Flannery*, 718 F.2d at 110.) To the extent that an award gave more than the actual loss suffered by the claimant, it was punitive under Federal law. *Flannery*, 718 F.2d at 111.

In *Flannery*, there was no likelihood that plaintiff would ever become aware of anything. The court held that an award for the loss of enjoyment of life could not provide him with any consolation or ease any burden resting upon him because he could not spend the monetary award upon necessities or pleasures. (*Flannery*, 718 F.2d at 111.) It was a compensatory award only to those relatives who would survive him. (*Flannery*, 718 F.2d at 111.) Since the award could not provide plaintiff with any direct benefit, the award was punitive and not allowable under the Federal Tort Claims Act. *Flannery*, 718 F.2d at 111.

Plaintiffs rely upon *Chambers v. Rush-Presbyterian-St. Luke's Medical Center* (1987), 155 Ill. App. 3d 458, 508 N.E.2d 426, and *Henry v. St. John's Hospital* (1987), 159 Ill. App. 3d 725, 512 N.E.2d 1044. But neither directly addressed the issue of whether an unconscious person may receive damages for disability. In *Chambers* (155 Ill. App. 3d at 467), defendants argued that there was no evidence that decedent suffered conscious pain and suffering during his

coma. The court only stated that there were facts in the record that could be "said to support the award for decedent's four-month coma." (*Chambers*, 155 Ill. App. 3d at 468.) In *Henry*, the court upheld a $10 million award in the case of an infant with cerebral palsy and retardation against an argument that the jury's verdict was influenced by passion and prejudice. *Henry*, 159 Ill. App. 3d at 735.

Reasoning similar to the Federal *Flannery* decision was given in *McDougald v. Garber* (Ct. App. 1989), 73 N.Y.2d 246, 254, 536 N.E.2d 372, 375, 538 N.Y.S.2d 937, 940, which held that there must be some level of cognitive awareness in order for a plaintiff to recover for the loss of enjoyment of life. The court stated that an award of damages for loss of enjoyment of life to a person whose injuries precluded any awareness of the loss did not serve a compensatory purpose because the award of damages in such circumstances had no meaning or utility to the injured person. (*McDougald*, 73 N.Y.2d at 254, 536 N.E.2d at 375, 538 N.Y.S.2d at 940.) Such an award would be punitive. *McDougald*, 73 N.Y.2d at 254, 536 N.E.2d at 375, 538 N.Y.S.2d at 940.

The dissent argued that the capacity to enjoy life was an attribute of an ordinary healthy individual and was compensable just as the loss of a limb. (*McDougald*, 73 N.Y.2d at 258, 536 N.E.2d at 377, 538 N.Y.S.2d at 942.) The inability to comprehend the degree to which plaintiff's life had been impaired was irrelevant because the impairment existed independently of the ability to apprehend it. (*McDougald*, 73 N.Y.2d at 258, 536 N.E.2d at 377, 538 N.Y.S.2d at 942-43.) The dissent rejected the majority's requirement that the award must have meaning or utility to the injured person. *McDougald*, 73 N.Y.2d at 258, 536 N.E.2d at 377, 538 N.Y.S.2d at 943.

In *Gregory v. Carey* (1990), 246 Kan. 504, 791 P.2d 1329, a man who was in a vegetative state as a result of surgery received an award for disability. Defendants objected to plaintiff's argument that the disabled patient suffered a loss of enjoyment of life. Defendants argued on appeal that if one could not suffer mental anguish, one could not suffer loss of enjoyment of life. The court held that it was proper for plaintiff to argue that the patient had suffered a loss of enjoyment of life and that the trial court properly instructed the jury that such a loss was an element of disability, pain, and suffering. *Gregory*, 246 Kan. at 513, 791 P.2d at 1336.

*Flannery v. United States* (W. Va. 1982), 297 S.E.2d 433, 439, which decided issues certified by the Fourth Circuit (as stated in *Flannery*, 718 F.2d 108), held that a plaintiff in a personal injury action who was permanently semi-comatose was entitled to recovery

for impairment of his capacity to enjoy life even though he was unaware of his loss.

■ The measure of disability damages is compensation for the disabling effect of the injury. (22 Am. Jur. 2d *Damages* §269, at 218 (1988).) The disabling effect logically includes the loss of enjoyment of life. We hold that disability damages may be awarded for the loss of enjoyment of life to a disabled person even if she was unaware of her loss because she had been deprived of her consciousness and therefore her ability to enjoy her life. An award for decedent's disability was proper here.

Defendant next argues that the trial court should not have instructed the jury about disfigurement because decedent was not aware of her marred physical appearance. Plaintiffs dispute the existence of a requirement that the victim must be aware of the disfigurement.

■ Whether or not there is an awareness requirement, the issue need not be addressed because there is no evidence in this record of the extent and type of disfigurement allegedly suffered by decedent. But, because the jury could have properly awarded $400,000 for decedent's disability alone, the combined award for disability and disfigurement is affirmed.

Defendant next argues that the trial court erred in barring evidence of decedent's four to six month separation from her husband, which allegedly occurred one and one-half years prior to decedent's death, because it was relevant to the loss of consortium claim.

■ Loss of consortium damages compensate a spouse for the loss of material services, companionship, happiness, and sexual intercourse. (*Malfeo v. Larson* (1990), 208 Ill. App. 3d 418, 425, 576 N.E.2d 364.) Even assuming that, in general, separation could be relevant to a loss of consortium claim, there is insufficient information in the record about the barred evidence to determine the relevance of the separation. Plaintiffs' argument that the separation was informal is only supported in the record by statements of plaintiffs' counsel, and defendant never made an offer of proof of the husband's testimony about the separation. The barring of evidence about the separation was not reversible error.

Defendant finally argues that the verdicts totalling $7.3 million were against the manifest weight of the evidence, were the result of passion and prejudice, were punitive in nature, and were excessive as a matter of law.

■ The Wrongful Death Act provides for recovery for the surviving spouse and next of kin of the deceased person of such dam-

ages as the jury deems a fair and just compensation with reference to the pecuniary injuries resulting from the death to such relatives. (Ill. Rev. Stat. 1991, ch. 70, par. 2.) Loss of consortium is appropriately considered as part of pecuniary damages under the Wrongful Death Act. *Drews v. Gobel Freight Lines, Inc.* (1991), 144 Ill. 2d 84, 91, 578 N.E.2d 970.

For loss of consortium, decedent's husband was awarded $1.2 million, and decedent's children were awarded $5 million. We cannot find that these awards were unfair.

The judgment of the trial court is affirmed.

Affirmed.

TULLY,* P.J., and RIZZI, J., concur.

---

*Justice White participated at oral argument prior to his retirement. Justice Tully read the briefs and the record and concurred with this opinion.