PER CURIAM.

(No. 5624— 

PETER GIANOS, Administrator of Estate of JERRY GIANOS, deceased, Claimant, *vs.* STATE OF ILLINOIS, DEPARTMENT OF MENTAL HEALTH, Respondent.

*Opinion filed March 5, 1975.*

HARRY B. ARON and MILTON W. GOLDMAN, Attorneys for Claimant.

WILLIAM J. SCOTT, Attorney General; BRUCE FINNE, ZEAMORE ADER and SAUL WEXLER, Assistant Attorneys General, for Respondent.

BURKS, J.

This claim, sounding in tort, seeks damages for the wrongful death of claimant's intestate, who committed suicide, and is based on the alleged negligence of re-

spondent's Illinois State Psychiatric Institute, hereafter referred to as "ISPI".

From the evidence, it appears that on June 13, 1968, claimant's intestate, who was a patient at ISPI, a facility operated by the State Department of Mental Health located at Ashland Avenue near Taylor Street in Chicago, eloped from said institution and thereafter, on said date, took his own life. Claimant contends that the State was negligent in failing to guard claimant's intestate and prevent him from leaving the hospital, since ISPI allegedly had knowledge of his propensity for leaving the premises, and that he was reasonably likely to commit suicide.

The evidence includes testimony of six psychiatrists on the issue as to whether or not the ISPI's policy of placing certain psychiatric patients in open wards, and specifically the application of said practice in the present case, was in accordance with good medical practice.

The evidence showed that the claimant's intestate was a twenty-five year old college student who had lived a normal life until he began to use drugs, including LSD and marijuana. Thereafter, his girl friend also left him and he became quite depressed. Ultimately, he was in such a condition that his family felt he needed medical attention. After a brief visit to ISPI, where he was not admitted, he was taken by the claimant to the Chicago Wesley Hospital, where he was restricted in his freedom, as are virtually all patients who are newly admitted to the psychiatric ward at Wesley until their condition has been fully evaluated. After two days at Wesley, claimant's intestate was referred to ISPI facility attached to the Department of Mental Health of the State of Illinois and, on June 11, 1968, he was admitted to this institu-

tion. His history was taken which indicated sadness, depression, possible suicidal ruminations, and other psychiatric disorders.

The general policy of the state hospital, ISPI, was one of open wards wherever possible, and, two days after he was admitted, the claimant's intestate attempted to leave ISPI. His elopment was successful and, shortly thereafter, claimant's intestate shot himself with a .38 pistol, committing suicide.

The testimony of the psychiatric experts was in complete disagreement concerning the open ward policy of ISPI, and they also disagreed in answer to a somewhat uniform hypothetical question concerning whether or not a patient with the condition of claimant's intestate should have been placed in a locked ward.

The court feels that the testimony of Dr. Jose F. Bayardo, the only testifying psychiatrist who actually examined claimant's intestate, Dr. Lester Rudy, Director of ISPI, and Dr. Harold M. Visotsky, Chairman of the Department of Psychiatry of Northwestern University's Medical School and a former director of the Illinois Department of Mental Health, should be accorded great weight. The court was particularly impressed by the testimony of Dr. Visotsky who strongly supported the open ward policy of ISPI, even though he was at the time Chief of Psychiatric Service at Wesley Hospital which places virtually all newly admitted psychiatric patients in locked wards.

In answer to a hypothetical question concerning the care to be afforded to a patient in the approximate condition of claimant's intestate, Dr. Visotsky persuasively supported the action of ISPI in the instant case. Dr. Visotsky's testimony stands as a definitive and con-

vincing analysis of ISPI's general policy and also its application to the present matter, as we will refer to again in this opinion. On the other hand, the court was not equally impressed by the testimony of the expert witnesses called by the claimant, and is strongly of the view that, though respected opinions may differ, the weight of medical evidence supports both the general policy of ISPI and the conduct of ISPI in the case at bar.

Respondent was not an insurer of Jerry Gianos, but was only under obligation to exercise reasonable care to protect him against a foreseeable injury. *Clifton, Adm.* v. *State, 24 C.C.R. 404.* The burden of proof is always on the claimant to warrant imposition of liability in negligence against a hospital. *Graham* v. *St. Luke's Hospital, 46 Ill. App.2d 147.*

The evidence in this case does not support a finding that respondent's ISPI knew or, in the exercise of reasonable care, would have known that Jerry Gianos was likely to commit suicide; nor that he was "reasonably expected" to do so, to lift the words used in §1-11 of the *Mental Health Code.*

Jerry Gianos was in Chicago Wesley Memorial Hospital for two days before he was brought by his mother and sister directly from the Wesley Memorial Hospital to the ISPI, which he entered as a voluntary patient.

Claimant bases his case largely on an assumption that Jerry Gianos attempted suicide in Wesley Hospital and, therefore, should have been kept in "detention" in a locked ward at ISPI. The evidence does not support the assumption nor the conclusion. The assumption was drawn from a statement which Dr. Bayardo of ISPI inserted in a lengthy report of psychiatric examination, dictated *after* he learned that the patient had committed

suicide. The doctor said he was trying to explain to himself "what had happened to Jerry for purposes of completing the chart", when he dictated the following statement on which the claimant bases his case:

"The patient had a history of 'dramatical, hysterical' attempts of suicide, as happened at Wesley when he was hitting the wall with his head."

Dr. Bayardo acknowledged that he had not examined the Wesley Hospital records when he wrote the above statement and characterizes it as a conclusion of his own, "and my interpretation of what I knew at the time. Since he had killed himself, I felt that *maybe* when he was hitting his head against the wall, it was a gesture of suicide." In the light of this explanation, and the facts in the record, we find that the statement in question was an erroneous conclusion of Dr. Bayardo inserted in his report as an afterthought.

The court, in examining the Wesley Hospital records, finds the only reference to an attempt at suicide was contained in the following statement in the "Nurses Daily Record" of June 9:

"His head felt like it was going to explode. This has steadily become worse until this morning in the bathroom and again this evening in the washroom, the patient attempted to commit suicide by spinning his head around in circles. After all, if it was about ready to explode, just a little more shaking was all it might need."

The nurse's conclusion that "spinning his head around" was a "significant" attempt at suicide is directly contradicted by the testimony of Wesley's Chief of Psychiatry, Dr. Visotsky, who said:

"The most common way to determine whether or not a patient is a suicidal risk is a history of relatively *significant* attempts. And by "significant attempts" I do not mean gestures. I mean significant attempts such as someone may cut their wrist, require some suturing. They may shoot themself and not die. They may take some poison and be found in time."

Again, in answer to a question based on the evidence

that Jerry Gianos "hit his head against the wall but not hard enough to raise a bruise or laceration", Dr. Visotsky said, "I would call that a gesture". Dr. Visotsky added that, if bumping one's head against the wall is an attempt at suicide, a large portion of our children must be regarded as suicide risks. Dr. Visotsky indicated that the "gesture" of hitting one's head against the wall is apparently an attempt to get attention.

Dr. Visotsky did say that, "A patient's telling you that he is going to commit suicide in no uncertain terms is also a higher indicator of risk". However, the evidence here shows that Jerry Gianos never spoke of suicide to anyone. His father, who was at Wesley when Jerry locked himself in the washroom, confirmed this, and also the fact that he did not notice any bruises on Jerry's head after his so-called attempt at suicide. Upon his arrival at ISPI, Dr. Bayardo interviewed Jerry Gianos and said, "I did not see any evidence in his behavior that he might hurt himself or others".

Not withstanding the nurse's notation in the Wesley record, discussed above, it is apparent that Wesley Hospital did not regard Jerry Gianos as a person dangerous to himself or to others. Wesley Hospital knew he was transferring to ISPI, and released him merely in the company of his mother and sister without confined transportation. Wesley did not tell his family, nor advise ISPI, that they thought he attempted suicide at Wesley.

Under these circumstances, we cannot hold as a matter of law that ISPI was negligent in failing to phone Wesley Hospital for their records before he was admitted to an open ward as a voluntary patient. Seeing no emergency indicated in the conduct of Jerry Gianos, ISPI merely requested the Wesley Hospital records by their usual procedures in such cases. These records had not

arrived in the two days that Jerry Gianos remained at ISPI. However, if the record had been received in advance, and if ISPI had spoken to the head of Wesley's psychiatric department by phone, it is likely that Dr. Visotsky would not have interpreted their record as showing any "significant" attempt at suicide, as he testified in this case.

Indeed, if ISPI had asked Dr. Visotsky's advice as to whether a patient in Jerry Gianos' condition should be placed in an open or closed ward, it is likely that his response would be similar to his testimony in this case, which bears repeating. Dr. Visotsky said,

> "Whether you used open ward or closed ward is dependent on the kind of treatment setting that you're running and what your goals for treatment are.
>
> "If your goals are solely to maintain life, then you must really put many patients in preventative detention. If you wish to treat a patient and give him some insight as to why he is feeling sick and why he is disturbed, then you have to trust him, and put him in a comfortable setting.
>
> "I know, for example, that patients *are stimulated to commit suicide when put in a closed ward.*
>
> "This *is* because of the confinement. The fact that people see them as dangerous. They have to act it out. There is no basic rationality. *You have to assess each patient in terms of your best judgment."*

We regard Dr. Visotsky as an eminently qualified expert under the rules discussed by the Supreme Court in *Darling* v. *Charleston Hospital (1966) 33 Ill. 2d 326 at pages 335 - 336.* We believe he has correctly stated the rule applicable in this case and that ISPI did, in fact, exercise its best judgment for the treatment of Jerry Gianos.

At ISPI, the hospital personnel, psychiatrists, nurses, psychiatric aids, and others, were in about a one-to-one ratio to patients. By the undisputed testimony, this was better than most State psychiatric hospitals and as good as private hospitals. The record indicates that all of these people exercised a reasonable degree of care for Jerry Gianos, knowing his condition, watching over his activi-

ties and progress. He was given medication four times a day. He was in the hands of competent people. They used their best judgment.

Not being blessed with 20-20-hindsight vision, Dr. Bayardo said in his testimony, "Knowing what I know now, I would have started proceedings to have him committed, but at that time, I didn't feel he was a suicidal risk. I might have given him a discharge if he had requested he be discharged from ISPI on either of the days he was there. I would have tried to talk him out of it. That is, I would have tried to convince him to stay."

The weight of the evidence indicates that Jerry Gianos would voluntarily stay at ISPI until the doctors released him. When he returned to the lobby on the first day of his admission at ISPI, he said that he wanted to go home, but his mother told him that he had to stay until the physician said he could go. He was cooperative and went back upstairs to his hospital room. This was not evidence that he would elope nor justify reasonable foreseeability that he would leave. On the morning of his departure, he went to the lobby, and when he was told by hospital personnel to go back to his room, he turned about with every indication that he would do so, but then left from a rear door.

This was about 10:30 A.M., less than two full days after his voluntary admission at ISPI, that Jerry Gianos left the facility without the consent of the hospital, and went to his home. ISPI immediately notified his mother, who went with his sister to the home of Jerry Gianos and found him there. The mother and sister held his door open and spoke with him. At his request, and apparently having no reason to foresee the possibility of his committing suicide, they permitted him to close the door. "He wanted to close the door, so I took my foot out of the

door," his mother said. A short time later, and while his mother and sister were still outside his home, Jerry Gianos shot himself in the head. After they heard the shot, his mother and sister went to the back door of his apartment, by which they had access to enter the apartment, and found him on the floor, wounded. He died some hours later.

Jerry Gianos was a handsome and talented young man. None of his friends nor any member of his family, who had observed him for many months, had any reason to believe that he might take his own life. He never spoke of suicide to anyone.

It was the considered opinion of the doctors at ISPI that he be kept in an open ward as the better method of treatment. A closed ward, in the medical judgment of the psychiatrists, would be contrary to the therapeutic progress of the patient, and would hinder his recovery.

The law is clear that the respondent is not liable if reasonable care is exercised by the attending physicians, as we find here, even though the physicians' judgment may prove to be erroneous. The fact that the medical judgment was made at the time a patient is admitted would not change this rule. Even after a mental patient has been hospitalized and under observation for a long period of time, an error in professional judgment concerning his release will not impose liability if reasonable care is exercised. The rule and rationale is well stated in *Taig* v. *State of New York, 241 N.Y.S. 2d 495 at page 496*:

"The prediction of the future course of a mental illness is a professional judgment of high responsibility and in some instances it involves a measure of calculated risk. If a liability were imposed on the physician or the State each time the prediction of future course of mental disease was wrong, few releases would ever be made and the hope of recovery and rehabilitation of a vast number of patients would be impeded and frustrated. This is one of the medical and public risks which must be taken on balance, even though it may sometimes result in injury to the patient or others."

382

We have examined the numerous authorities cited by the claimant in his well-drawn briefs, but must distinguish them from the case at bar in that here we find no significant evidence that the patient was reasonably expected, at the time the determination was made or within a reasonable time thereafter, to physically injure himself or other persons.

For the above stated reasons, the claim must be and is hereby denied.