(No. 88-CC-1610-)

KAY E. HEFTI, Administratrix of the Estate of TROI P. HEFTI, deceased, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed May 7, 1996.*

*Opinion as modified on rehearing filed June 30, 1997.*

HAMM & HANNA (TRACY C. LITZINGER, of counsel), for Claimant.

JIM RYAN, Attorney General (TERENCE J. CORRIGAN, Assistant attorney General, of counsel), for Respondent.

64

## OPINION

EPSTEIN, J.

This is a wrongful death claim brought by the administratrix of the decedent's estate, his mother, alleging negligence by the Department of Mental Health and Developmental Disabilities (DMHDD) at its Zeller Mental Health Center which allegedly caused or negligently permitted the suicide of the decedent, Troi Hefti, a 17-year-old patient at the time of his death on June 24, 1987.

This cause is before us for final ruling, following a trial before our former commissioner, Richard H. Parsons, on May 19, 1993. Commissioner Parsons' report and recommendations were submitted to us, as was the trial transcript. This opinion follows our own detailed and lengthy review of this said and very difficult record.

### Summary of the Claim

Claimant Kay Hefti brought this claim in 1988 in her capacity as the administratrix of the estate of Troi Hefti. Essentially, the allegations are that Troi Hefti was an extremely troubled boy from an early age who had been physically self-abusive for a long time and had been repeatedly

diagnosed as such and as seriously dangerous to himself, and had long been in State DMHDD facilities where his behavior and diagnosis were well known. Claimant advances two theories of DMHDD negligent culpability for Troi Hefti's suicide: (1) the actions of a DMHDD physician who without any reasonable basis unilaterally ordered the cessation of the 15-minute suicide watch on Troi, on the day of his suicide; and (2) the oversight of DMHDD staff in leaving a hanging instrument openly available to Troi in the shower of his facility, where he obtained it and hung himself.

The State, for its part, filed a counterclaim seeking reimbursement for its expenses of caring for Troi Hefti, pursuant to the provisions of the Mental Health Code. This counterclaim is sought, essentially, as an offset against any award that might result.

### The Facts

On June 24, 1987, Troi Hefti was a resident and patient in the George A. Zeller Mental Health Center ("Zeller") when he was found hanging in a bathroom at approximately 6:15 p.m. on that day. The underlying facts are sad and not seriously controverted.

Troi Hefti was born February 16, 1970, and began having behavioral problems at about age five. He was first institutionalized at age 11. He had been in various institutions over the last six or seven years of his life. His history showed extreme and bizarre self-abusive behavior which regularly resulted in serious and permanent injuries. Troi was a problem child and a problem patient. He was a frequent resident of Zeller in particular, where his self-abusive behavior and suicide threats were well known. Ultimately, that pattern of behavior resulted in his death.

Troi was last admitted to Zeller on August 20, 1986, ten months before his death; he had been a patient at

Zeller on five previous occasions. His typical modus operandi was to tell anyone anything in order to get his own way. He was adamantly opposed to discipline and to reductions of his privileges. The trial evidence, particularly the testimony of several professionals, showed clearly that the staff at Zeller knew of Troi's self-abusive behavior and occasional suicide threats.

On the day of Troi's death, the physician in charge (the "staff physician") of the children's adolescent unit at Zeller, in which Troi was resident, was Dr. James L. Weiler who was filling in for Dr. Marcia Aranas. Dr. Weiler was somewhat familiar with Troi's behavior history and some of his prior episodes.

Dr. Weiler knew that Troi had threatened to kill himself (by putting a necktie around his neck) on December 22, 1986. Dr. Weiler knew that Troi had frequent outbursts of aggression in March 1987, and was unable to handle his anger and frustration, and was also aware that in May 1987, Troi was so frustrated and upset over his mother having removed his clothes (in order to discourage his frequent breakouts or "elopements") that he became self-abusive, suicidal and threatened to kill himself and others. Dr. Weiler recalled that on one occasion Troi grabbed a pair of sewing scissors and threatened to gouge his own eyes out. He also knew that after Troi's elopement from and return to Zeller, Troi had stated that he would not hesitate to do bodily harm to himself if "pushed to the limit."

Dr. Weiler did not recall that Troi told his mother that he was going to do something to himself several days before the suicide. Director Roland Chambers testified that Dr. Weiler and he talked to Troi about the statement Troi had made that he was going to kill himself and at that time Troi said that he was not suicidal.

Approximately one week before Troi's death, he told his mother he was considering suicide. She was deeply concerned and believed her son. She discussed this with the staff personnel and the director of the unit at Zeller. She strongly disagreed with Mr. Chamber's opinion that Troi was just trying to get attention and that the behavior just needed to be ignored.

Roland Chambers, director of the unit, testified that he knew Troi had, in fact, injured himself intentionally on more than one occasion. He was aware that Troi had jumped out of a moving vehicle that resulted in the amputation of his arm below the elbow. Mr. Chambers also was informed about the time Troi hung from a third-story window and the time when Troi purposely slammed his fingers in a door to cause injury. He knew about the incident where Troi threatened to gouge out his eyeball with scissors and the time when Troi slammed his fist into the wall. He acknowledged that Troi had been on the status of SOS (suicidal precautions) in the past at Zeller. A week before Troi's death, Mr. Chambers was made aware that Troi stated to several people that he was going to kill himself. This was also entered in Troi's chart.

Nevertheless, on the date of Troi's death, Dr. Weiler ordered a discontinuation of the 15-minute suicide checks on Troi.

The charge nurse, Delaine Gamble, was acquainted with the threats Troi made to harm himself and was aware of the various times Troi did harm himself. She testified that he previously injured himself four or five times. She knew that Troi had said he would be out of there one way or the other several days before he committed suicide. She stated that all threats had to be put on his chart. She recalls that Troi was on suicide precaution a couple of times in the past.

*Mary Grimes*, a registered nurse on the unit, was asked to transfer to this unit because three other nurses were absent. She also knew about the previous times Troi had injured himself. She had heard from other staff that Troi threatened to take his life a few days before he actually committed suicide. She knew that Troi had been taken off the 15-minute checks. However, she testified that she and charge nurse Gamble did not agree with that decision, that they kept a regular watch on Troi despite the order and that they tried to know where Troi was at all times because they knew of his elopement and suicide threats.

**Nathan Dixon**, a mental health technician on the unit, knew of Troi's self-inflicted injuries and of the recent threat of suicide. He testified that on each occasion that Troi threatened to elope or eloped, when he returned he would state he was not going to do that again which was also his behavior after each occasion that Troi injured himself.

On the day of Troi's death, he was able to go unattended into the showers in his unit at Zeller, where bandannas and shower hooks were provided by the DMHDD, and which Troi Hefti used, finally, to make good on his threats of suicide.

## Analysis

### 1. The Law of the Claim

The State and its agencies, including the DMHDD, owe their wards and patients the duty of protection and reasonable care. These duties of care must take account of the patient's known condition, and may include safeguarding a patient from dangers due to mental or physical incapacities that are known to the State, or that by the exercise of reasonable care ought to be known by the State.

However, as our opinions constantly emphasize, the State is not an insurer of the safety of the patients under the care of its agencies, including DMHDD. *Reynolds v. State* (1983), 35 Ill. Ct. Cl. 647, 649.

As in any suit predicated on negligence, the elements of recovery are the breach of a duty of care, consequential injury resulting proximately from the breach, and damages. In a wrongful death suit, the damages recoverable include the statutorily allowed pecuniary damages for loss of present and future support for those dependent on the decedent (740 ILCS 180/2), as well as loss of society and consortium, but not in the case of deceased children subject to deduction of child-rearing expenses, but recovery is not allowed for mental anguish of the survivors. *Bullard v. Barnes* (1984), 102 Ill. 2d 505, 486 N.E.2d 1228; *Drews v. Global Freight Lines, Inc.* (1991), 144 Ill. 2d 84, 578 N.E.2d 970; *Holston v. Sisters of the Third Order* (1991), 247 Ill. App. 3d 985, 618 N.E.2d 334.

## 2. The Liability Issue

This record is replete with evidence of repeated serious self-abuse and ongoing suicide threats by Troi Hefti, all of which were well known to the Zeller staff of the DMHDD. It is clear to this court, after review of this record, that the DMHDD staff at the Zeller Center were negligent in both of the key respects alleged.

First, Dr. Weiler's order striking the standing 15-minute checks on Troi was as culpable and irresponsible a medical action as this court has seen in a long time. No basis was shown that might possibly have warranted that decision at the time, based on what Dr. Weiler actually knew and what he should have known from the records and the consensus of his staff. The record provides no basis, after the fact, that might justify that decision.

However, as negligent and almost cavalier we find that decision to have been, we cannot and will not find liability on the basis of Dr. Weiler's negligence. This is because of the testimony of the Zeller staff on Troi's unit that they essentially ignored Dr. Weiler's removal of the 15-minute checks on Troi. These staffers, more sensible by far than their medical supervisor, tried their best on a difficult service and although sadly that was not enough to prevent Troi's suicide, their efforts break any possible chain of causation between Dr. Weiler's order and the death of Troi Hefti. Thus, this act of negligence cannot be a proximate cause of Troi's suicide.

On the other hand, the failure of the DMHDD to prevent access to potential and fairly obvious suicide devices, and to leave such materials in a readily accessible place on the unit which is frequented by a known suicidal patient in a mental facility is another matter altogether. While we do not doubt for a minute, based on this record, that the Zeller staff tried to patrol the area, it is clear that those efforts were not adequate. We are persuaded in good measure because of the location and frequency of access of the suicide location. It was a failure of due care not to patrol the shower area constantly, as hanging in showers is a known and unfortunately well established suicide technique in institutions. But for Troi's access to the bandanna in or proximate to the shower area, he could not have killed himself that day by any other means that have been shown to be available to him at the Zeller unit.

Respondent's argument that the decedent was not labeled "suicidal" at the time of his death is unpersuasive and almost an admission of negligence in light of the overwhelming evidence in this record. This court is sensitive to the ease with which after-the-fact reviews by courts and other laypeople can second guess medical professionals

whose knowledge and perspective at the time, and under trying and pressured circumstances, is very different and whose decisions and actions must take place in a very different context than our more leisurely review. However, this is not a difficult case in terms of the key personnel's knowledge and professional understandings at the time. If Troi Hefti was not diagnosed or labeled suicidal on the day of his death, someone blew it very badly.

Moreover, by DMHDD's own standards, something was wrong, as its treatment plans specify that patients be placed in "suicidal status" for any attempts at self-abuse, which had occurred with this patient on multiple occasions and was well known.

Respondent contends that the Claimant must produce expert testimony to be successful in her claim of medical or professional negligence. Although that may be the general rule for reviewing technical competence of professionals, expert testimony is not required if the negligence is so readily apparent or the treatment is of such a common occurrence that a layman would have no difficulty appraising it. (*Dimitrijeic v. Chicago Wesley Memorial Hospital* (1968), 93 Ill. App. 2d 251, 236 N.E.2d 309.) There is more than adequate basis in this record for us to find negligence, as we do.

It must be clarified that the claim here is *not* that DMHDD was negligent in failing to diagnose or to affirmatively designate the deceased as a suicidal risk. Instead, the claim here is predicated on the decedent's death being the proximate result of the State's failure to provide supervision and its actual provision of the means of suicide, in light of DMHDD's extensive knowledge of this patient and lengthy experience with his actual behavior and threats. Provisions of bandannas and shower hooks to a known self abuser who repeatedly threatens

suicide is—at a minimum—a failure to exercise due care for that patient's safety.

Our commissioner has specifically found that this patient (and the unit) was not supervised or patrolled closely enough under the circumstances to comport with reasonable standards of care. From our more distanced review of this record, we agree with his conclusion. Nothing argued by the Respondent comes close to persuading us otherwise. The DMHDD did not use due care in protecting Troi Hefti from harming himself and from committing suicide. As a proximate result of this negligence, Troi killed himself.

This case is factually distinguishable, and simply different, from the cases on which the Respondent relies to avoid liability. The gross evidence of self abuse in this case distinguishes it from *Dimitrijevic, supra,* and other cases cited by the Respondent. In *Reynolds v. State* (1983), 35 Ill. Ct. Cl. 647, 549, another suicide case, the deceased was known to attempt escape, but was not known to be abusive or suicidal beforehand; escape tendencies or escape behavior do not indicate or suggest suicide.

Similarly, while John Britton was known to be in constant trouble, and to engage in loud talking, fighting and rebelling against institutional rules, that behavior was not enough to put the State on notice of possible suicide. (*Woods v. State* (1985), 38 Ill. Ct. Cl. 9, 24.) *Woods* bears no similarity to this case.

In the suicide of Jerry Gianos, Dr. Visotsky, an honored former director of the department, testified that, "A patient's telling you that he is going to commit suicide in no uncertain terms is also a higher indicator of risk." In that case, however, the evidence showed that Jerry Gianos

never spoke of suicide to anyone. Dr. Bayardo interviewed him and noted that he did not see any evidence in his behavior that he might hurt himself or others. (*Gianos v. State* (1975), 30 Ill. Ct. Cl. 373, 376.) *Gianos*, to the extent relevant here, supports liability as it enhances the duty of care owed.

In this case, Troi Hefti's mind was not merely unstable, nor did he simply threaten elopement as were the facts in the cases cited by Respondent. In this case, it is clear he was actively self-abusive and openly threatened suicide. With this knowledge, the State should not have provided or allowed a bandanna anywhere near Troi nor anywhere accessible to Troi. Without very close supervision, a self-abusive, mentally unstable individual who recently threatened suicide is a high-risk patient. The evidence here showed that Troi was obviously and visibly upset on the day of his suicide with denial of privileges immediately beforehand. In these circumstances, the State's efforts fell short.

### 3. The State's Counterclaim

On November 8, 1991, the Respondent asked for leave to file a counter-complaint for services rendered and paid. Claimant maintains that consideration of a set-off is improper because the State failed to plead and prove demand, proper itemization, and proof as required by the Mental Health Code. This argument, and Respondent's argument that Claimant failed to exhaust her administrative remedies, need not be considered.

The counterclaim for services of the DMHDD is brought pursuant to the Mental Health Code, which *inter alia* provides "Except that no responsible relative may be held liable for charges for services furnished to a recipient if such charges were assessed more than 5 years prior to the time the action is filed." This requires the counter-complaint

offset be dismissed as barred as to services accruing more than five years prior to November 8, 1991. Formerly Ill. Rev. Stat., Ch. 91½, par. 5—113; *see* 405 ILCS 5/5—113 (1994).

In addition, under the Wrongful Death Act, recovery is for the sole benefit of the next of kin for the pecuniary loss (and loss of society) sustained by the death of the relative. (*See, e.g., Ohnesorge v. Chicago City Railway Co.* (1913, 259 Ill. 424, 102 N.E. 819, 821.) The Wrongful Death Act further provides that the person furnishing hospitalization in connection with the decedent's last injury or illness can receive a reimbursement *only* where the deceased person left no surviving spouse or next of kin. (740 ILCS 180/2.) Even assuming that DMHDD might somehow qualify here as having provided hospitalization, the Claimant's survival of the decedent here precludes any payment to DMHDD.

### 4. The Award

Claimant does not contend that she or the family were, or were likely to be, financially dependent on Troi Hefti for support. The court cannot entertain a pecuniary damages award in this case.

On the other hand, Troi Hefti left behind a loving family of siblings, as well as his mother, the Claimant-administratrix whose recovery must compensate for all their loss. Loss of society is difficult to measure and even more difficult to compensate. The record in this case, however, shows that as difficult a child as Troi Hefti was, he was close to his siblings as well as to his mother, all of whom maintained a genuine and seemingly close relationship with him and regularly visited him, despite his overt self-destructive behavior. Indeed, this record reflects a remarkably close family under extraordinarily difficult circumstances.

After reviewing this record and considering wrongful death awards by this and other Illinois courts, we conclude that the award of $100,000 should be granted to the decedent's estate for equal distribution to the surviving siblings and mother of the decedent.

### Conclusion and Order

For the foregoing reason, we find for the Claimant's negligence claim for the wrongful death of the decedent, and enter judgment for the Claimant and against the Respondent. The Respondent's counter claim is dismissed.

It is ordered: Claimant Kay E. Hefti, Administratrix of the Estate of Troi P. Hefti, Deceased, is awarded the sum of $100,000 in full and complete compensation for the wrongful death of Troi Hefti for his estate and his heirs.

### OPINION AS MODIFIED ON REHEARING

EPSTEIN, J.

This is a wrongful death claim brought by the Administratrix of the decedent's estate, his mother, alleging negligence by the Department of Mental Health and Developmental Disabilities ("DMHDD") at its Zeller Mental Health Center which allegedly caused or negligently permitted the suicide of the decedent, Troi Hefti, a 17-year-old patient at the time of his death on June 24, 1987.

This cause is before us for final ruling, following a trial before our former commissioner, Richard H. Parsons, on May 19, 1993. Commissioner Parsons' report and recommendations were submitted to us, as was the trial transcript. This opinion follows our own detailed and lengthy review of this sad and very difficult record.

### Summary of the Claim

Claimant Kay Hefti brought this claim in 1988 in her capacity as the administratrix of the Estate of Troi Hefti.

Essentially, the allegations are that Troi Hefti was an extremely troubled boy from an early age who had been physically self-abusive for a long time and had been repeatedly diagnosed as such and as seriously dangerous to himself, and had long been in State DMHDD facilities where his behavior and diagnosis were well known. Claimant advances two theories of DMHDD negligent culpability for Troi Hefti's suicide: (1) the actions of a DMHDD physician who without any reasonable basis unilaterally ordered the cessation of the 15-minute suicide watch on Troi, on the day of his suicide; and (2) the oversight of DMHDD staff in leaving a hanging instrument openly available to Troi in the shower of his facility, where he obtained it and hung himself.

The State, for its part, filed a counterclaim seeking reimbursement for its expenses of caring for Troi Hefti, pursuant to the provisions of the Mental Health Code. This counterclaim is sought, essentially, as an offset against any award that might result.

The Facts

On June 24, 1987, Troi Hefti was a resident and patient in the George A. Zeller Mental Health Center ("Zeller") when he was found hanging in a bathroom at approximately 6:15 p.m. on that day. The underlying facts are sad and not seriously controverted.

Troi Hefti was born February 16, 1970, and began having behavioral problems at about age five. He was first institutionalized at age 11. He had been in various institutions over the last six or seven years of his life. His history showed extreme and bizarre self-abusive behavior which regularly resulted in serious and permanent injuries. Troi was a problem child and a problem patient. He was a frequent resident of Zeller in particular, where his self-abusive behavior and suicide threats were well known. Ultimately, that pattern of behavior resulted in his death.

Troi was last admitted to Zeller on August 20, 1986, ten months before his death. He had been a patient at Zeller on five prior occasions. His typical modus operandi was to say anything to get his own way. He was adamantly opposed to discipline and to reduction of his privileges. The trial evidence, particularly the testimony of the professionals, showed clearly that the staff at Zeller knew of Troi's self-abusive behavior and occasional suicide threats.

On the day of Troi's death, the physician in charge (the staff physician) of the children's adolescent unit at Zeller, in which Troi was resident, was Dr. James L. Weiler who was filling in for Dr. Marcia Aranas. Dr. Weiler was somewhat familiar with Troi's behavior history and some of his prior episodes.

Dr. Weiler knew that Troi had threatened to kill himself (by putting a necktie around his neck) in December, 1986, and that Troi had frequent outbursts of aggression and was unable to handle his anger and frustration. He was also aware that in May 1987, Troi was so frustrated and upset over his mother having removed his clothes (to discourage his frequent breakouts or "elopements") that he became self-abusive, and threatened to kill himself and others. Dr. Weiler recalled that on one occasion Troi grabbed a pair of sewing scissors and threatened to gouge his own eyes out. He also knew that after Troi's elopement from and return to Zeller, Troi had stated that he would not hesitate to do bodily harm to himself if "pushed to the limit."

Dr. Weiler did not recall that Troi told his mother that he was going to do something to himself several days before the suicide. Director Roland Chambers testified that Dr. Weiler and he talked to Troi about the statement Troi had made that he was going to kill himself and at that time Troi said that he was not suicidal.

Approximately one week before Troi's death, he told his mother he was considering suicide. She was deeply concerned and believed her son. She discussed this with the staff personnel and the director of the unit at Zeller. She strongly disagreed with Mr. Chamber's opinion that Troi was just trying to get attention and that the behavior just needed to be ignored.

Roland Chambers, director of the unit, testified that he knew Troi had, in fact, injured himself intentionally on more than one occasion. He was aware that Troi had jumped out of a moving vehicle that resulted in the amputation of his arm below the elbow. Mr. Chambers also was informed about the time Troi hung from a third-story window and the time when Troi purposely slammed his fingers in a door to cause injury. He knew about the incident where Troi threatened to gouge out his eyeball with scissors and the time when Troi slammed his fist into the wall. He acknowledged that Troi had been on the status of SOS (suicidal precautions) in the past at Zeller. A week before Troi's death, Mr. Chambers was made aware that Troi stated to several people that he was going to kill himself. This was also entered in Troi's chart.

Nevertheless, on the date of Troi's death, Dr. Weiler ordered a discontinuation of the 15-minute suicide checks on Troi.

The charge nurse, Delaine Gamble, was acquainted with the threats Troi made to harm himself and was aware of the various times Troi did harm himself. She testified that he previously injured himself four or five times. She knew that Troi had said he would be out of there one way or the other several days before he committed suicide. She stated that all threats had to be put on his chart. She recalls that Troi had been on suicide precaution several times in the past.

Mary Grimes, a registered nurse on the unit, was asked to transfer to this unit because three other nurses were absent. She also knew about the previous times Troi had injured himself. She had heard from other staff that Troi threatened to take his life a few days before he actually committed suicide. She knew that Troi had been taken off the 15-minute checks. However, she testified that she and charge nurse Gamble did not agree with that decision, that they kept a regular watch on Troi despite the order and that they tried to know where Troi was at all times because they knew of his elopement and suicide threats.

Nathan Dixon, a mental health technician on the unit, knew of Troi's self-inflicted injuries and of the recent threat of suicide. He testified that on each occasion that Troi threatened to elope or eloped, when he returned he would state he was not going to do that again which was also his behavior after each occasion that Troi injured himself.

On the day of Troi's death, he was able to go unattended into the showers in his unit at Zeller, where bandannas and shower hooks were provided by the DMHDD, and which Troi Hefti used, finally, to make good on his threats of suicide.

## Analysis

### 1. The Law of the Claim

The State and its agencies, including the DMHDD, owe their wards and patients the duty of protection and reasonable care. These duties of care must take account of the patient's known condition, and may include safeguarding a patient from dangers due to mental or physical incapacities that are known to the State, or that by the exercise of reasonable care ought to be known by the State.

However, as our opinions constantly emphasize, the State is not an insurer of the safety of the patients under the care of its agencies, including DMHDD. *Reynolds v. State* (1983), 35 Ill. Ct. Cl. 647, 649.

As in any suit predicated on negligence, the elements of recovery are the breach of a duty of care, consequential injury resulting proximately from the breach, and damages. In a wrongful death suit, the damages recoverable include the statutorily allowed pecuniary damages for loss of present and future support for those dependent on the decedent (740 ILCS 180/2), as well as loss of society and consortium, but not in the case of deceased children subject to deduction of child-rearing expenses, but recovery is not allowed for mental anguish of the survivors. *Bullard v. Barnes* (1984), 102 Ill. 2d 505, 486 N.E.2d 1228; *Drews v. Global Freight Lines, Inc.* (1991), 144 Ill. 2d 84, 578 N.E.2d 970; *Holston v. Sisters of the Third Order* (1991), 247 Ill. App. 3d 985, 618 N.E.2d 334.

## 2. The Liability Issue

The record is replete with evidence of repeated serious self-abuse and ongoing suicide threats by Troi Hefti, all of which were well known to the Zeller staff of the DMHDD. It is clear to this court, after review of this record, that the DMHDD staff at the Zeller Center were negligent.

The record provides no basis, either at the time or after the fact, for Dr. Weiler's order discontinuing the 15-minute checks on Troi. However, as incorrect and seemingly cavalier as that decision proved to have been, we cannot and will not find liability on the basis of that order. This is because of the clear and undisputed testimony of the Zeller staff on Troi's unit that they essentially ignored Dr. Weiler's removal of the 15-minute checks on Troi. These sensible and dedicated staffers tried their best on a

difficult service. Although sadly that was not enough to prevent Troi's suicide, their efforts break any possible chain of causation between Dr. Weiler's order and the death of Troi Hefti. Thus this act, even if negligent, could not be a proximate cause of Troi's suicide.

On the other hand, the failure of the DMHDD to prevent access to potential and fairly obvious suicide devices, and to leave such materials in a readily accessible place on the unit which is frequented by a known self-destructive—and suicide-threatening—patient in a mental facility is another matter altogether. While we do not doubt for a minute, based on this record, that the Zeller staff tried to patrol the area, it is clear that those efforts were inadequate in an environment that was not rigorously scrubbed of self-destructive implements. We are also persuaded in part by the location and frequency of access of the suicide location. It was a failure of due custodial care not to patrol the shower area constantly: hanging in showers is a known and unfortunately well established suicide technique in institutions. But for Troi's access to the bandanna in or proximate to the shower area, he could not have killed himself that day by any other means that have been shown to be available to him at the Zeller unit.

Respondent's argument that the decedent was not labeled "suicidal" or formally diagnosed as such at the time of his death is unpersuasive, and almost irrelevant. This claim does not turn on the foreseeability of suicide. The foreseeability of serious self-abusive conduct by Troi Hefti is the point. And that was manifestly and undisputedly foreseeable. (Indeed, on this record, anyone on the staff at Zeller who might claim not to have foreseen the likelihood of Troi Hefti engaging in further self-abuse could do so credibly only if they were unfamiliar with his history,

which hopefully did not include anyone responsible for his custody or care.) Of course, self-abuse may or may not result in death. But that is hardly a defense in this case. The kind of serious abuse that young Mr. Hefti had repeatedly engaged in was capable of causing death, but that too is largely irrelevant. The overwhelming evidence in this record shows that the responsible staff at Zeller knew that Troi Hefti was a serious physical danger to himself; the degree of likely harm is simply not the point.

This court is sensitive to the ease with which after-the-fact reviews by courts and other laypeople can second guess medical professionals whose knowledge and perspective at the time, and under trying and pressured circumstances, is very different and whose decisions and actions must take place in a very different context than our more leisurely review. However, this is not a difficult case, and this is not a case that involves review of medical or diagnostic judgments. In terms of the key personnel's knowledge and professional understandings at the time, it is clear that Troi Hefti—even if, *arguendo*, he was correctly undiagnosed as suicidal on the day of his death— was nonetheless known to be a serious and substantial danger to himself. That is enough to require custodial scrutiny that was lacking here.

Moreover, by DMHDD's own standards, something was wrong with the Zeller staff's classification of Troi Hefti, as its treatment plans specify that patients be placed in "suicidal status" for any attempts at self-abuse, which had occurred with this patient on multiple occasions and was well known.

Respondent contends that the claimant must produce expert testimony to be successful in a claim of medical or professional negligence. That is the general rule for reviewing technical competence of medical professionals.

As we stated above, this is not a professional malpractice claim. Expert testimony is not required for a second reason. Where the negligence is so readily apparent or the treatment is of such a common occurrence that a layman would have no difficulty appraising it, expert testimony is not critical. (*Dimitrijeic v. Chicago Wesley Memorial Hospital* (1968), 93 Ill. App. 2d 251, 236 N.E.2d 309.) There is more than adequate basis in this record for us to find clear and obvious negligence, as we do.

Given the contentions of the Respondent on rehearing, we must emphasize again that the claim here is *not* that DMHDD was negligent in failing to diagnose or to affirmatively designate the deceased as a suicidal risk or in its medical treatment of the decedent. Instead, the claim here is predicated on the decedent's death being the proximate result of the State's failure to provide supervision and its actual provision or negligent tolerance of the means of suicide, in light of DMHDD's extensive knowledge of this patient and his actual behavior and threats. We view this as an extreme, and hopefully singular case. Provisions of bandannas and shower hooks to a known self-abuser who repeatedly threatens suicide is—at a minimum—failure to exercise due care for that patient's safety.

From our view of the record we conclude that the decedent was not supervised or patrolled closely enough under the circumstances to comport with reasonable standards of care. Nothing argued by the respondent comes close to persuading us otherwise. The DMHDD did not use due care in protecting Troi Hefti from harming himself and from committing suicide. As a proximate result of this negligence, Troi killed himself.

This case is factually distinguishable, and simply different, from the cases on which the respondent relies to avoid liability. The gross evidence of self-abuse in this case

distinguishes it from *Dimitrijevic, supra,* and other cases cited by the respondent. In *Reynolds v. State* (1983), 35 Ill. Ct. Cl. 647, 549, another suicide case, the deceased was known to attempt escape, but was not known to be abusive or suicidal beforehand; escape tendencies or escape behavior does not indicate or suggest suicide.

Similarly, while John Britton was known to be in constant trouble, and to engage in loud talking, fighting and rebelling against institutional rules, that behavior was not enough to put the State on notice of possible suicide. (*Woods v. State* (1985), 38 Ill. Ct. Cl. 9, 24.) *Woods* bears no similarity to this case.

In the suicide of Jerry Gianos, Dr. Visotsky, an honored former Director of the Department, testified that "A patient's telling you that he is going to commit suicide in no uncertain terms is also a higher indicator of risk." In that case, however, the evidence showed that Jerry Gianos never spoke of suicide to anyone. Dr. Bayardo interviewed him and noted that he did not see any evidence in his behavior that might hurt himself or others. (*Gianos v. State* (1975), 30 Ill. Ct. Cl. 373, 376.) *Gianos,* to the extent relevant here, supports liability as it enhances the duty of care owed.

In this case, Troi Hefti's mind was not merely unstable, nor did he simply threaten elopement as were the facts in the cases cited by respondent. In this case, it is clear he was actively self-abusive and openly threatened suicide. With this knowledge, the State should not have provided or allowed a bandanna anywhere near Troi nor anywhere accessible to Troi. Without very close supervision, a self-abusive, mentally unstable individual who recently threatened suicide is a high-risk patient. The evidence here showed that Troi was obviously and visibly upset on the day of his suicide with denial of privileges

immediately beforehand. In these circumstances, the State's efforts fell short.

### 3. The Award

Claimant does not contend that she or the family were, or were likely to be, financially dependent on Troi Hefti for support. There can be no pecuniary damages award in this case.

On the other hand, Troi Hefti left a family of siblings, as well as his mother, the Claimant-administratrix whose recovery must compensate all for their loss. Loss of society is difficult to measure and even more difficult to compensate. The record in this case, however, shows that as difficult a child as Troi Hefti was, he was close to his siblings as well as to his mother, all of whom maintained a close relationship with him and regularly visited him, despite his overt self-destructive behavior. This record reflects a close family under difficult circumstances.

After reviewing this record, and considering wrongful death awards by this and other Illinois courts, we conclude that the award of $100,000 should be granted to the decedent's estate for equal distribution to the surviving siblings and mother of the decedent.

### 4. The State's Counterclaim

On November 8, 1991, the Respondent asked for leave to file a counter-complaint for services rendered by DMHDD to Troi Hefti in the amount of $52,326.60. The procedural disposition of this counterclaim by our commissioner is not altogether clear, but both sides have treated the counterclaim as filed and have vigorously pursued their positions on this aspect of the case. The Court treats the counterclaim as filed and before us for adjudication.

The DMHDD's counterclaim is for the costs of its services to the late Troi Hefti, and is brought pursuant to

sections 5—105 through 5—116 of the Mental Health Code (now 405 ILCS 5/5—105 through 5/5—116) (the MHC), which *inter alia* provides in material part:

"§5—105. Each recipient of services provided * * * by the Department and the estate of that recipient is liable for the payment of sums representing charges for services to the recipient at a rate to be determined * * * in accordance with this Act. * * * If * * * the estate of the recipient is insufficient, the responsible relatives are severally liable for the payment of those sums or for the balance due * * *. If the recipient is under the age of 18, the recipient and responsible relative shall be liable for medical costs on a case-by-case basis for services for the diagnosis and treatment of conditions other than that child's handicapping condition. The liability shall be the lesser of the cost of medical care of the amount of responsible relative liability established by the Department under Section 5—116. * * * the maximum service charges for each recipient assessed against responsible relatives collectively may not exceed financial liability determined from income in accordance with Section 5—116. * * *.

§5—111. Any person who has been issued a Notice of Determination of sums due as service charges may petition the Department for a review of that determination. The petition must be * * * filed * * * within 90 days * * *. The Department shall provide for a hearing * * * shall take testimony and preserve a record of all proceedings * * *. Any person aggrieved by the decision * * * may within 30 days thereafter, filed a petition * * * for review of such decision by the Board of Reimbursement Appeals. * * *.

§5—113. Upon receiving a petition for review under Section 5—111, the Department shall * * * notify the Board of Reimbursement Appeals which shall renders its decision * * * within 30 days * * * and certify such decision to the Department * * *. Upon request of the Department, the State's Attorney of the county in which a responsible relative or a recipient who is liable under this Act for payment of * * * service charges resides, shall institute appropriate legal action against any such responsible relative, or the recipient or within the time provided by law shall file a claim against the estate of such recipient who fails or refuses to pay those charges. The court shall order the payment of sums due for services charged for such period or periods of time as the circumstances require, expect that no responsible relative may be held liable for charges for services furnished to a recipient if such charges were assessed more than 5 years prior to the time the action is filed; but such 5 year limitation does not apply to the liability of a recipient or recipient's estate. * * *."

In its initial arguments, the Claimant maintained that consideration of a set-off for "service charges" of the DMHDD is improper because the State failed to plead and prove demand or "assessment," proper itemization, and proof as required by section 5—105 and section 5—111 of the Mental Health Code. Claimant also contends that the 5-year limitation provision in section 5—113 of

the Mental Health Code bars this counterclaim. Finally, Claimant urges that the Wrongful Death Act does not allow recovery proceeds to be paid to the DMHDD as a health care provider (creditor) of the decedent, on the theory that the only hospitalization expenses that can be claimed from wrongful death recoveries are those of the decedent's last illness, which are not involved here.

In its initial arguments, the Respondent argued that Claimant failed to exhaust her administrative remedies as to the details of the DMHDD expense counterclaim, and disputed all of the Claimant's arguments. With respect to the 5-year limitation period of section 5—113, the Respondent urged that the relation-back provision of section 3—207 of the Code of Civil Procedure (735 ILCS 5/13—207) applies to the counterclaim and relates it back either to the date of the filing of the complaint in this case, or to the date of Troi Hefti's claim (on the theory that the claim against the Estate, as well as the Wrongful Death Act claim against the DMHDD accrued on that date).

In our initial, vacated decision, we dismissed the counterclaim. On the Respondent's petition, we granted rehearing on this issue, and heard oral argument and accepted supplemental briefs. In light of the initial arguments and the additional arguments advanced on rehearing, we must address the construction and application of the Mental Health Code, the Wrongful Death Act, and our own Court of Claims Act to the instant facts. Surprisingly, these seem mostly to be questions of first impression.

The first issue is whether any claim lies for DMHDD to recover the proceeds of the award in the Claimant's wrongful death action, which is said to be the sole asset of the Claimant estate against which recovery is sought by the counterclaim.

Under the Wrongful Death Act, recovery is for the sole benefit of the next of kin for the pecuniary loss and loss of society sustained by the death of the relative, and is generally not subject to the decedent's creditor's claims. (*See, e.g., Ohnesorge v. Chicago City Ry. Co.* (1913), 259 Ill.424, 102 N.E. 819, 821; *Greenock v. Merkel* (1979), 71 Ill. App. 3d 958, 390 N.E.2d 78.) The Wrongful Death Act further provides that the person furnishing hospitalization in connection with the decedent's last injury or illness can receive reimbursement only where the deceased person left no surviving spouse or next of kin (740 ILCS 180/2), which is not the case here, even assuming *arguendo* that DMHDD might somehow qualify here as having provided such last-illness hospitalization.

On the other hand, as the Respondent correctly points out, its counterclaim is predicated on a separate, independent statutory liability and statutory cause of action under the Mental Health Code and does not therefore rely on the Wrongful Death Act to authorize recovery. However, notwithstanding this alternative source of the counterclaim's cause of action, we find nothing in the Mental Health Code provisions that supersedes the Wrongful Death Act—or that contravenes the policy of that Act's immunization of wrongful death recoveries from otherwise valid claims against the decedent's estate. Thus, while section 5—105 generally imposes liability on beneficiary-decedents' estates as well as imposing residuary liability on the "responsible relatives" of the decedent, that liability does not reach wrongful death benefits recovered by the estate and distributable to the decedent's survivors.

This takes the analysis to the residual liability of the "responsible relatives" under section 5—105. In this case, under the definition section 1—124 of the Mental Health Code, the "responsible relative" means the decedent's

parent, as Troi Hefti was under 18 when he died. The portion of the claimant estate's wrongful death recovery that is distributable or that is distributed to the decedent's mother, Kay E. Hefti, is thus reachable as her asset, based on her liability as the decedent's "responsible relative" under section 5—105 of the Mental Health Code. (Given our award, the amount thus is issue in the counterclaim is $25,000.) This point was agreed by both parties at the oral argument.

Mrs. Hefti's share of the wrongful death award is reachable through the estate, over which this court has jurisdiction (as it is the Claimant), whereas we lack jurisdiction over Mrs. Hefti personally, as she is not individually a party in this proceeding. Moreover, we find that we can reduce the award to the Claimant estate by the amount of any counterclaim award, under the set-off provision of section 26 of the Court of Claims Act ("any recovery awarded by the court shall be subject to the right or set-off") and under our jurisdictional authority over recoupments under section 8(e) of the Court of Claims Act. (705 ILCS 505/8(e), 505/26.) Although neither of these provisions of our enabling statute creates a cause of action—which must separately be found in statute or common law—both provide procedural authorization to entertain and to give effect to cognizable substantive claims of the State against the Claimant.

This analysis also partly disposes of the Claimant's contention that the DMHDD cannot pursue its "service charges" for Troi Hefti's care as a counterclaim in this court for the reason that the Mental Health Code provides that the State's Attorney of the responsible relative's county of residence shall bring the action. In effect, Claimant contends that the statutory procedure for civil enforcement by the State's Attorneys is exclusive. We disagree. There is no language in the statute so indicating.

Moreover, the provision as written is a directive to the State's Attorneys to sue when so requested by the Department, and not otherwise. See section 5—113 of the Mental Health Code. There is no proviso derogating from the authority of the department or the Attorney General to enforce the "liability" expressly created in section 5—105 of the Mental Health Code. In any event, the set-off provision of section 26 of the Court of Claims Act directs us to entertain set-off claims of the State against "any recovery" we may award to a Claimant.

Thus we come to the two procedural issues that apply specifically to this claim against the Hefti Estate: (1) Claimant's argument that the DMHDD never properly "assessed" any "charges for services" as required by the statute, and (2) that this counterclaim is barred by the 5-year statute of limitations of section 5—113 of the Mental Health Code. These issues arise in the factual context of the DMHDD having first asserted its $52,000 plus claim for "service charges" for Troi Hefti's care in the counterclaim filed in this court, with no prior assertion of these charges to the estate or to Mrs. Hefti individually.

The issues here are whether the DMHDD complied with the procedural requirements of the MHC so that its counterclaim can proceed under the authority of that statute, or whether DMHDD violated any mandatory procedures so that its claim for "service charges" in this case cannot proceed on the basis of the MHC authorization. The MHC procedure commences with the issuance of a "Notice of Determination" by the DMHDD. (405 ILCS 5/5—111.) That notice triggers a series of administrative procedures and appeals, first to the DMHDD staff and then to the 3-member Board of Reimbursement Appeals appointed by the Governor. The "assessment" of the DMHDD also triggers the commencement of the 5-year

limitation period under section 5—113 for civil actions by the State's Attorney against "responsible relatives."[1]

In this case, there was no "notice of determination." This omission had the effect of not allowing the Claimant to dispute the amount of the DMHDD's charges claim in the established administrative channels. (This seems particularly important in a case like this one, where the decedent was under 18, so that not all expenses of his care are chargeable under the statute. *See* MHC section 5—105 of the Mental Health Code.) In the absence of any "assessment" by the DMHDD, the 5-year limitation period seemingly did not commence. On the other hand, the absence of any notice or assessment also short-circuited the specific administrative system established by the legislature for the narrow task of reviewing the legitimacy of DMHDD "service charges."

If the procedures utilized in this case by the DMHDD are allowed, then one of two consequences appears to follow: (1) disputes of DMHDD "service charges" would be remitted to this court for adjudication, or (2) the "responsible relative" or the estate of a deceased recipient would be deprived of any forum in which to contest the "service charges" claim. The former procedure would be clumsy and inefficient, at best, and contrary to the statutory scheme and administrative structure established by the general assembly specifically for adjudication of these specialized "service charge" disputes. The latter would violate due process notions and would be inconsistent with the

---

[1] There was no agreement by the parties as to what the undefined statutory term "assessment" means in MHC §5—111. A close study of this part of the Mental Health Code dealing with financial responsibility for "service charges" discloses that for this purpose "assessment" refers either to the initial Notice of Determination specified by §5—111 or to a modified determination after a redetermination by the Department or pursuant to a directive of the Board of Reimbursement Appeals under Sec. 5—111 or to a modified determination after a redetermination by the Department or pursuant to a directive of the Board of Reimbursement Appeals under Sec. 5—111. The final determination issued (to the recipient or the estate or the responsible relative) is the "assessment" that starts the 5-year limitation period under Sec. 5—113.

statute as well. We also do not find any purpose to be served by allowing the DMHDD (or its successor) to utilize this Court to circumvent its own statute and its own procedures whenever it neglects to timely issue a notice of determination.

The statute requires the DMHDD to commence the process of assessing and collecting "service charges" from recipients, their estates or their "responsible relative" by issuing a notice of determination, and that notice must be construed to be a condition of the remainder of the statutory scheme, including the imposition of liability. In the absence of a notice of determination, there can be no liability, and no claim or counterclaim predicated on such liability. For this reason, we must dismiss the counterclaim.

### 5. Allowance of Attorney's Fees.

Claimant's counsel, supported by the Claimant, has petitioned the court to allow him to be paid a contingent fee in excess of the statutory 20% maximum in cases before this court, in accordance with section 26.1 of the Court of Claims Act. (705 ILCS 505/26.1.) Claimant requests 33 1/3%, which request is supported by Mrs. Hefti, the administratrix of the Claimant estate, as well as by the original 1987 fee agreement between them, which was submitted as an exhibit following oral argument, with leave of the Court. The Court conducted a hearing on the fee petition at the oral argument on rehearing and accepted supplemental submissions.

After much deliberation, and after consideration of the parties' agreement, the time expended by counsel, the level of difficulty and complexity of the trial and trial preparation, and of the issues in the case, the Court has determined that an allowance of a contingent fee in excess of 20% is justified. The Court allows a contingent fee of 33 1/3% of the recovery net of expenses and costs that are paid or reimbursed.

## Conclusion and Order

For the foregoing reason, we find for the Claimant's negligence claim for the wrongful death of the decedent, and will enter an award for the Claimant. The Respondent's counterclaim will be dismissed for failure to comply with section 5—111 of the Mental Health Code. Accordingly, it is ordered:

1. Claimant Kay E. Hefti, administratrix of the estate of Troi P. Hefti, deceased, is awarded the sum of $100,000 in full and complete compensation for the wrongful death of Troi Hefti for his estate and his heirs, such award to be divided equally between Kay E. Hefti, the decedent's mother, and the decedent's surviving siblings;

2. The Respondent's counterclaim is dismissed; and

3. Payment of a contingent fee of 33 1/3% to Claimant's counsel is allowed, after payment or reimbursement of costs and expenses of this litigation.